IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

DONALD J. TRUMP, in his capacity as
The 45th President of the United States,

*Plaintiff-Appellant,*

v.

BENNIE G. THOMPSON, in his official capacity as Chairman of the United States
House Select Committee to Investigate the January 6th Attack on the United States
Capitol; THE UNITED STATES HOUSE SELECT COMMITTEE TO INVESTIGATE
THE JANUARY 6th ATTACK ON THE UNITED STATES CAPITOL; DAVID S.
FERRIERO, in his official capacity as Archivist of the United States; and THE
NATIONAL ARCHIVES AND RECORDS ADMINISTRATION,

*Defendant-Appellees.*

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

BRIEF FOR PLAINTIFF-APPELLANT
DONALD J. TRUMP

———————————

Jesse R. Binnall
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, VA 22314
Tel: (703) 888-1943
Fax: (703) 888-1930
jesse@binnall.com

Justin R. Clark
ELECTIONS, LLC
1050 Connecticut Avenue, NE, Suite 500
Washington, D.C. 20036
(202) 987-9944
justin.clark@electionlawllc.com

**COUNSEL FOR PRESIDENT DONALD J. TRUMP**

# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASE

The undersigned counsel of record certifies that the following

interested persons and entities described in Rule 28(a)(1)(A) have an

interest in the outcome of this case. These representations are made in

order that the judges of this Court may evaluate possible disqualification or

recusal.

## A. Parties and Amici

The parties that appeared before the district court and that are before

this Court are:

### 1. Plaintiff-Appellant

President Donald J. Trump

### 2. Current and Former Attorneys for Plaintiff-Appellant

Current Attorneys:
Jesse R. Binnall
Binnall Law Group, PLLC
717 King Street, Suite 200
Alexandria, Virginia 22314

Justin R. Clark
Elections, LLC
1050 Connecticut Ave NE, Suite 500
Washington, DC 20036

Former Attorneys:

None.

**3. Defendants-Appellees**

Bennie G. Thompson

The United States House Select Committee to Investigate the January 6th Attack on the United States Capitol

David S. Ferriero

The National Archives and Records Administration

**4. Current and Former Attorneys for Defendants-Appellees**

Current Attorneys:

Douglas N. Letter
Stacie M. Fahsel
Eric R. Columbus
Todd B. Tatelman
Office of General Counsel
U.S. House of Representatives
5140 O'Neill House Office Building
Washington, D.C. 20515

Annie L. Owens
Joseph W. Mead
Mary B. McCord
Institute for Constitutional Advocacy and Protection
Georgetown University Law Center
600 New Jersey Avenue NW
Washington, D.C. 20001
*Attorneys for or Defendants Bennie G. Thompson and the United States House Select Committee to Investigate the January 6th Attack on the United States Capitol*

Brian M. Boynton
Brian D. Netter
Elizabeth J. Shapiro
James J. Gilligan
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW, Room 12100
Washington, D.C. 20530
*Attorneys for NARA defendants*

Former Attorneys:

None.

5.  **Other Interested Persons (Amici)**

Anne H. Tindall
Cameron Kistler
Erica Newland
John Langford
United To Protect Democracy
2020 Pennsylvania Ave. NW, #163

Washington, DC 20006
*Attorneys for Amicus Curiae Former Members of Congress*

John A. Freedman
Owen Dunn
Samuel F. Callahan
Arnold & Porter Kaye Scholer LLP
601 Massachusetts Ave, NW
Washington, DC 20001-3743
*Attorneys for Amicus Curiae Former Members of Congress*

Kelly B. McClanahan, Esq.
National Security Counselors
4702 Levada Terrace
Rockville, MD 20853
*Attorney for Amicus Curiae Government Information Watch, National Security Counselors, and Louis Fisher*

## B. Rulings Under Review

The ruling under review is the Order of the U.S. District Court for the

District of Columbia (Chutkan, J.), docketed November 9, 2021, denying

Plaintiff-Appellant Donald J. Trump's Motion for Preliminary Injunction.

*Trump v. Thompson,* 2021 WL 5218398 (D.D.C. 2021).

## C. Related Cases

The case now pending before this Court was previously before the

district court below and this Court for Plaintiff-Appellant's Emergency

Motion for an Administrative Injunction. Plaintiff-Appellant is not aware of

any other related case pending before this Court or any court.

/s/ Jesse R. Binnall
Jesse R. Binnall
*Counsel for President Donald J. Trump*

# TABLE OF CONTENTS

CERTIFICATE AS TO PARTIES,.............................................................................i

RULINGS, AND RELATED CASE........................................................................ ii

TABLE OF CONTENTS .......................................................................................vi

TABLE OF AUTHORITIES................................................................................. vii

GLOSSARY ..........................................................................................................xi

JURISDICTIONAL STATEMENT .........................................................................3

STATEMENT OF ISSUES.....................................................................................4

STATUTES AND REGULATIONS ........................................................................5

STATEMENT OF THE CASE ................................................................................5

STANDARD OF REVIEW....................................................................................12

SUMMARY OF ARGUMENT..............................................................................12

ARGUMENT ........................................................................................................16

   I.   President Trump is Likely to Succeed on the Merits ........................... 17

   II.   Irreparable Harm..................................................................................... 48

   III.  Balance of Equities and Public Interest ................................................. 51

CONCLUSION .....................................................................................................54

CERTIFICATE OF COMPLIANCE ......................................................................55

CERTIFICATE OF SERVICE...............................................................................56

# TABLE OF AUTHORITIES

**Cases**

*Ass'n of Cmty. Orgs. for Reform Now (ACORN) v. FEMA,*
   463 F. Supp. 2d 26, 36 (D.D.C. 2006) ............................................................. 52

*Cheney v. U.S. Dist. Court,*
   542 U.S. 367, 387 (2004) ...................................................................................... 26

*Council on American-Islamic Relations v. Gaubatz,*
   667 F. Supp. 2d 67, 76 (D.D.C. 2009) ............................................................. 50

*Doe v. Mattis,*
   928 F.3d 1, 7 (D.C. Cir. 2019) ........................................................................... 16

*Exxon Corp. v. FTC,*
   589 F.2d 582, 592 (D.C. Cir. 1978) .................................................................. 32

*Fund for Animals v. Norton,*
   281 F. Supp. 2d 209, 222 (D.D.C. 2003) ....................................................... 53

*Gordon v. Holder,*
   721 F.3d 638, 653 (2013) .................................................................................... 52

*Guitierrez de Martinez v. Lamagno,*
   515 U.S. 417, 428 (1995) ...................................................................................... 38

*In re Beef Indus. Antitrust Litig.,*
   589 F.2d 786, 787-88 (5th Cir. 1979) .............................................................. 32

*In re Ford Motor Co.,*
   110 F.3d 954, 963 (3d Cir. 1997) ..................................................................... 50

*In re Sealed Case No. 98-3077,*
   151 F.3d 1059, 1065 (D.C. Cir. 1998) ............................................................. 50

*In re Sealed Case,*
    121 F.3d 729, 742 (D.C. Cir. 1997) ................................................................. 36

*Judicial Watch, Inc. v. Dept. of Justice,*
    365 F.3d 1108, 1114 (D.C. Cir. 2004) ............................................................. 36

*Kilbourn v. Thompson,*
    103 U.S. 168, 182–89 (1880) ............................................................................ 19

*MediNatura, Inc. v. FDA,*
    998 F.3d 931, 940 (D.C. Cir. 2021) ................................................................. 12

*Metro. Life Ins. Co. v. Usery,*
    426 F. Supp. 150, 172 (D.D.C. 1976) ............................................................. 51

\* *Nixon v. Adm'r of Gen. Servs. ("GSA"),*
    433 U.S. 425, 439 (1977) ................................................................. 14, 39, 50

*Nken v. Holder,*
    556 U.S. 418, 435 (2009) ................................................................................. 51

*O'Donnell Const. Co. v. Dist. of Columbia,*
    963 F.2d 420, 429 (D.C. Cir. 1992) ................................................................. 52

*PepsiCo, Inc. v. Redmond,*
    1996 WL 3965, at \*30 (N.D. Ill. 1996) ............................................................ 51

*Providence Journal Co. v. FBI,*
    595 F.2d 889, 890 (1st Cir. 1979) .............................................................. 51, 53

*Senate Select Comm. on Presidential Campaign Activities v. Nixon,*
    498 F.2d 725, 731 (D.C. Cir. 1974) ................................................................. 23

*Shapiro v. U.S. Dep't of Justice,*
    2016 WL 3023980, at \*7 (D.D.C. May 25, 2016) ........................................... 53

\* *Trump v. Mazars USA, LLP,*
   *140 S. Ct. 2019, 2032 (2020)* ....................................................passim

\* *U.S. Servicemen's Fund v. Eastland,*
   488 F.2d 1252, 1259 (D.C. Cir. 1973) ............................................. 19

\* *United States v. Nixon,*
   418 U.S. 683, 708 (1974) .................................................. 7, 16, 36, 47

*United States v. Reynolds,*
   345 U.S. 1, 7 (1953) ......................................................................... 49

*Watkins v. United States,*
   354 U.S. 178, 197 (1957) ...........................................................passim

**Statutes**

28 U.S.C. § 1292(a)(1) ........................................................................ 4

28 U.S.C. § 1331 ................................................................................ 3

\* 44 U.S.C. § 2204 ................................................................... 8, 34, 48

\* 44 U.S.C. § 2205 ................................................................... 9, 33, 34

**Other Authorities**

Exec. Order No. 13489, 74 Fed. Reg. 4669 (Jan. 26, 2009) ............... 10

*The Federalist No. 10,* p. 79 (C. Rossiter ed. 1961) (J. Madison) ....... 38

**Regulations**

36 C.F.R. § 1270.44 ......................................................................... 50

36 C.F.R. § 1270.44 (2002) ..................................................... 9, 33, 34

**U.S. Constitution**

U.S. Const. art. I, § 8 ............................................................. 19

U.S. Const. art. III, § 1 ............................................................ 42

_____

\* Authorities upon which President Trump chiefly relies are marked with an asterisk.

# GLOSSARY

Archivist                     The Archivist of the United States

Committee                   United States House Select Committee to
                            Investigate the January 6th Attack on the United
                            States Capitol

EOP                         Executive Office of the President

H. Res. 503                 House Resolution 503

NARA                        National Archives and Records Administration

OVP                         Office of the Vice President

PRA                         Presidential Records Act

Principles of ordered liberty and limited government forbid the exercise of government power beyond limits imposed by our Constitution and laws. Appellees and the court below contend that Congress possesses almost limitless power to issue requests for sensitive, privileged presidential records on any matter, at any time, for any reason. This unprecedented claim lacks a limiting principle, is not consistent with our constitutional separation of powers, and should be rejected. Further, under our Constitution and laws, no individual, including the sitting President, has the unilateral power to extinguish the executive privilege rights of living, former Presidents. Indeed, it is well settled that executive privilege survives a President's term of office. At minimum, a dispute concerning the production of records subject to executive privilege must be resolved through the applicable constitutional and statutory framework, including a thorough examination of the documents at issue through the standard judicial process for privilege claims.

Here, a congressional committee sent an unprecedented and overbroad records request effectively seeking every presidential record and

communication that could tenuously relate to events that occurred on January 6, 2021. It did so by casting a "wide net" for nearly every communication and record created in the White House from April 2020 onward. JA 205. The district court sanctioned this request, which it openly admitted was "unbelievably broad," without identifying a single piece of proposed legislation or the relation of the requested records to advancing such legislation. JA 257. Moreover, the district court misapplied the constitutional and statutory scheme used to determine the applicability of executive privilege.

Both Appellees and the district court justified this overbroad request by claiming unprecedented powers for both Congress and the incumbent President. The lower court effectively held that the decision of an incumbent former President regarding privilege claims of a living former President was the final word on executive privilege and vitiated limits on congressional power to request information. As the district court correctly noted, "Presidents are not kings," yet congressional power is not limitless, regardless of presidential dictate. JA 194; *Kilbourn v. Thompson*, 103 U.S. 168,

182 (1880); U.S. CONST. Art. 1, § 1, cl. 1. The law is clear that disagreements between incumbent and former Presidents on the assertion of executive privilege over records created during such former President's tenure are subject to meaningful judicial review, not a rubber stamp.

The stakes in this case are high. A decision upholding the Committees' request to NARA would have enormous consequences, forever changing the dynamics between the political branches. It is naïve to assume that the fallout will be limited to President Trump or the events of January 6, 2021. Every Congress will point to some unprecedented thing about "this President" to justify a request for his presidential records. In these hyper-partisan times, Congress will increasingly and inevitably use this new weapon to perpetually harass its political rival.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this case pursuant to 28 U.S.C. § 1331 because it involves issues arising under the Constitution and laws of the United States. On November 9, 2021, the district court denied President Trump's Motion for a Preliminary Injunction. JA 216. That same day,

President Trump timely filed his notice of appeal. JA 217. Accordingly, this Court has jurisdiction pursuant to 28 U.S.C. § 1292(a)(1).

## STATEMENT OF ISSUES

1. Did the district court err when it determined that a congressional records request for presidential records did not violate the Constitution or statute when it was admittedly broad and inadequately linked to a legislative purpose or constitutional prerogative of Congress?

2. Did the district court err in concluding that an incumbent President has unfettered discretion in deciding whether to produce records of a living, former President to Congress notwithstanding a former President's assertion of executive privilege?

3. Is a living former President of the United States irreparably harmed by the production of his confidential presidential records to Congress, despite his objection that the request is contrary to the Constitution and the laws of the United States and over his assertion of executive privilege?

4. Did the district court err when it held that a former President was not entitled to an injunction because equitable injunctive factors favored production of the presidential records at issue, despite the constitutional infirmities of the requests and the chilling effects in executive deliberations that will inevitably result from disclosure?

## STATUTES AND REGULATIONS

This case involves the Presidential Records Act, of 1978, 44 U.S.C. §§ 2201-2209 and the regulations implementing the Presidential Records Act, 36 C.F.R. §§ 1270.01-1270.50.

## STATEMENT OF THE CASE

After the 2020 election, Democrats in Congress created the United States House Select Committee to Investigate the January 6th Attack on the United States Capitol pursuant to House Resolution 503 to effectively intimidate and harass President Trump and his closest advisors under the guise of investigating the events of January 6, 2021. House Resolution 503 purports to vest the Committee with unfettered powers to investigate the activities of intelligence agencies, law enforcement agencies, and the Armed

Forces surrounding January 6th, and provides that the Committee will issue a final report on its activities. JA 92-105. It also specifically prohibits the Committee from holding the markup of any legislation. *Id*. at 100. This erodes any asserted legislative purpose of the Committee. Notably, this resolution never discusses the authority to investigate the Executive Office of the President. *Id.* at 92-105.

On August 25, 2021, the Committee sent self-described "sweeping" requests for presidential records to the Archivist of the United States seeking information from the Executive Office of the President and the Office of the Vice President. JA 33-44. These requests were signed by Committee Chairman Bennie G. Thompson. *Id.* at 33. The Committee's requests are startling in scope and utterly lacking in specificity. For example, among myriad other documents requested, the Committee seeks:

> [a]ll documents and communications relating in any way to remarks made by Donald Trump or any other persons on January 6, including Donald Trump's and other speakers' public remarks at the rally on the morning of January 6, and Donald Trump's Twitter messages throughout the day.

*Id.* at 34. Similarly, and even more invasive, the Committee requested, "[f]rom November 3, 2020, through January 20, 2021, all documents and communications related to prepared public remarks and actual public remarks of Donald Trump." *Id.* at 41.

Issued public statements are one thing, but the notion that Congress is somehow entitled to ask for and review any and all private conversations, remarks, or drafts of public statements considered by the President of the United States and his close advisors, without limitations on, among other things, subject matter, would destroy the very fabric of our constitutional separation of powers and invade fundamental privileges designed to maintain the autonomy and functioning of the Executive Branch. *See Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2032 (2020) ("[Executive] privilege safeguards the public interest in candid, confidential deliberations within the Executive Branch; it is 'fundamental to the operation of Government.'") (quoting *United States v. Nixon*, 418 U.S. 683, 708 (1974)). The Committee has also requested "[a]ll documents and communications within the White House on January 6, 2021, relating in any way to . . . the January 6, 2021,

rally . . . [or] Donald J. Trump" and countless other individuals including close personal advisors to the President. JA at 35 (emphasis added).

The Committee's request purports to be made "pursuant to the Presidential Records Act (44 U.S.C. § 2205(2)(C))," *see* JA 33. The Presidential Records Act ("PRA") of 1978, 44 U.S.C. §§ 2201–2209, governs the official records of Presidents and Vice Presidents. The Archivist and the National Archives and Records Administration ("NARA") are charged with working with a former President to administer and store presidential records, among other duties, after the President leaves office. *See generally* 44 U.S.C. §§ 2202–2208.

Under the PRA, the President is permitted to specify a term not to exceed twelve years after his term, during which access to presidential records will be restricted. *See* 44 U.S.C. § 2204. Section 2205(2)(C) provides three exceptions to the PRA's access restrictions. In pertinent part, it states "Presidential records shall be made available . . . (C) to either House of Congress, or, to the extent of matter within its jurisdiction, to any committee or subcommittee thereof if such records contain information that is needed

for the conduct of its business and is not otherwise available." 44 U.S.C.

§ 2205(2)(C).

The PRA gives the Archivist the power to promulgate regulations to

administer the statute. 44 U.S.C. § 2206.  Pursuant to those regulations, the

Archivist must promptly notify the former and incumbent Presidents of a

request for records that were created during that former President's term of

office. 36 C.F.R. § 1270.44 (2002). The incumbent or former President must

personally assert a claim of constitutionally based privilege against

disclosing a presidential record or a reasonably segregable portion thereof.

*Id.* If a former President asserts privilege, the Archivist consults the

incumbent President to determine whether the incumbent President agrees.[1]

*Id.* If, as here, the incumbent President chooses to waive, the Archivist

discloses the presidential record unless a court directs otherwise. *Id.*

_____

[1] While the Archivist makes determinations as to responsiveness and searches for such documents, there is no constitutional or statutory basis for him to serve as an adjudicator of questions regarding the assertion or waiver of privilege. Likewise, the Archivist's position on whether Congress has met its burden under law to only serve requests that are specifically tethered to a legislative purpose is immaterial.

Finally, Executive Order No. 13489 requires the Archivist to notify both Presidents of his determination to release certain records at least thirty days prior to disclosure of the records, unless a shorter time period is allowed under the NARA regulations. Exec. Order No. 13489, 74 Fed. Reg. 4669 (Jan. 26, 2009).

Pursuant to this regulatory and statutory framework, the Archivist notified President Trump on August 30, 2021, that he intended to produce certain documents in response to the Committee's expansive request. JA 110. On October 8, 2021, the Biden White House notified the Archivist that it would not be asserting executive privilege over certain documents identified as responsive to the Committee's request. *Id* at 107-108. That same day, pursuant to the PRA, associated regulations, and the applicable executive order, President Trump notified the Archivist that he has made a formal assertion of executive privilege with respect to a small subset of documents as well as a protective assertion of executive privilege over any additional materials that may be requested by the Committee. *Id.* at 110–11.

Subsequently, President Trump made a further assertion of executive privilege on October 21, 2021. *Id.* at 165–71.[2]

The Biden White House notified the Archivist that it would not assert executive privilege over the privileged documents identified in President Trump's October 8 letter and instructed the Archivist to turn the records over to the Committee thirty days from the date of notifying President Trump of Biden's decision, absent an intervening court order. JA 113.

On October 13, 2021, the Archivist notified President Trump that, "[a]fter consultation with Counsel to the President and the Acting Assistant Attorney General for the Office of Legal Counsel, and as instructed by President Biden" the Archivist has "determined to disclose to the Select Committee" all responsive records that President Trump determined were subject to executive privilege on November 12, 2021, absent an intervening court order. *Id.* at 162-163. Likewise, the Archivist notified President Trump

---

[2] NARA's review of responsive records continues on a rolling basis; on November 15, 2021, President Trump made another assertion of privilege.

that further documents would be released over his privilege objections on November 26, 2021, absent a court order. *Id.* at 176.

President Trump acted promptly; he filed his complaint on October 18, 2021, JA at 6-119, and his Motion for a Preliminary Injunction on October 19, 2021. After briefing, the district court heard argument on November 4, 2021, and denied the President's motion on November 9, 2021. *Id.* at 216. President Trump filed his Notice of Appeal that same day, *Id.* at 217, and shortly thereafter moved the district court for an injunction pending appeal or an administrative injunction. The district court subsequently denied President Trump's motion, *Id.* at 281–86, but this Court granted an administrative injunction and expedited the appeal.

## STANDARD OF REVIEW

A circuit court reviews a district court's weighing of the four preliminary injunction factors for abuse of discretion; it considers legal conclusions *de novo. MediNatura, Inc. v. FDA*, 998 F.3d 931, 940 (D.C. Cir. 2021). The questions underlying issues 1, 2, and 3 are all legal disputes; they relate to legal holdings made by the district court regarding the

constitutional and statutory rights of former President's to challenge records requests by Congress and whether, as a matter of law, a former President is irreparably harmed by the release of those records absent an injunction. Consequently, the Court reviews each of those questions *de novo. See Gordon v. Holder,* 632 F.3d 722, 725 (D.C. Cir. 2011). Issue 4 concerns balancing equities and public interest in deciding whether to grant an injunction. While any balancing analysis in an injunction is generally reviewed for abuse of discretion, the legal conclusion of whether a constitutional or statutory right applies, is a legal determination and is also reviewed *de novo. Id.*

## SUMMARY OF ARGUMENT

The district court's ruling misapplied binding Supreme Court precedent when it authorized the Committee's overly broad records request and minimized President Trump's legitimate interest in exerting executive privilege. The court's cursory misapplication of the Supreme Court's *Mazars* factors and the specific requirements of the PRA, ignores the expansive scope of the requests here and wrongly justifies it based upon the improper and ineffective waiver of executive privilege by the incumbent President.

The lower court also adopted an unprecedented and unfounded test for deciding disputes regarding executive privilege between an incumbent and former President. The court wholly ignored the Supreme Court's clear statement that executive "privilege survives the individual President's tenure," *Nixon v. Adm'r of Gen. Servs. ("GSA")*, 433 U.S. 425, 439 (1977), and instead wrongly insisted that the incumbent President's decision to waive the privilege overruled the former President's assertion of it. Additionally, the district court wholly ignored the PRA's limitations on Congress's authority to access and review presidential records. In essence, the district court ruled that the sitting President has the sole power to invoke executive privilege, regardless of statutory and constitutional limitations. This decision would gut the foundation of executive privilege and hamstring all officials within the Executive Branch that rely upon the privilege for the proper functioning of the government. Moreover, the PRA specifically confers on former Presidents the power to vindicate their interests in court.

Congressional committees' investigatory powers are confined by their legislative function, certain statutory parameters, and the legitimate

constitutional prerogatives of the co-equal branches of government. Yet, the Committee seeks disclosure of potentially millions of pages of documents that have little to no bearing on the events of January 6th in a misguided attempt to harass President Trump and senior members of his administration. Regardless of President Biden's position with respect to the production, Congress has not and cannot meet its constitutional and statutory burdens of showing a reasonable connection between the categories of presidential records sought and its purported legislative purpose.

The Court should balance the needs of judicial economy and expediency. Instead of rubber-stamping Congress's requests, the Court should find that the Committee's requests fail to comply with the Constitution, the PRA, and its associated regulations. Alternatively, the district court should be instructed to grant the preliminary injunction and perform a full examination of the privileged documents at issue to determine whether President Trump's assertion of executive privilege is valid.

## ARGUMENT

Contrary to the decision of the district court, President Trump is entitled to a preliminary injunction because (a) the Committee's request is not in furtherance of a legitimate legislative purpose, *Mazars*, 140 S. Ct. at 2035, and (b) the request seeks clearly privileged documents and the Committee lacks a specific need for the requested information, *Nixon*, 418 U.S. at 713. A preliminary injunction should issue based on the consideration of four factors: (i) whether the party seeking the injunction is likely to succeed on the merits of the action, (ii) whether the party is likely to suffer irreparable harm without an injunction, (iii) whether the balance of equities tips in the party's favor, and (iv) whether an injunction would serve the public interest. *Doe v. Mattis*, 928 F.3d 1, 7 (D.C. Cir. 2019).

President Trump is likely to succeed on the merits. The disagreement between an incumbent President and his predecessor from a rival political party highlights the importance of executive privilege and the ability of presidents and their advisers to reliably make and receive full and frank advice, without concern that communications will be publicly released to

meet a political objective. This rationale, which is the is the crux of executive privilege, is totally undermined by the district court's opinion. When the Supreme Court noted that executive privilege exists for the benefit of the Republic, it meant the People's interest in a functioning government, not the whims of the sitting President who may be unable see past his own political considerations. Granting interim relief will permit the Court to consider the important constitutional issues here, and, after consideration of the evidence, to come to thorough, reasoned conclusions.

The Plaintiff also satisfies the other factors of the four-factor test for a preliminary injunction. President Trump is likely to prevail on the merits of his constitutional and statutory claims, he will suffer irreparable harm if the status quo is not preserved, and the balance of harms and public interest favor interim relief. The district court failed to apply this standard to the facts of this case properly and thus should be reversed.

## I.    President Trump is Likely to Succeed on the Merits

The Appellant is likely to succeed on the merits of his claims that the expansive request here (a) serves no valid legislative purpose, (b) is

prohibited because the Committee's request exceeds the statutory framework set forth in the PRA and associated regulations, and (c) seeks documents that are protected by numerous legal privileges and the Committee has no specific need for the requested records.

### a. The Request Serves No Legislative Purpose, an Essential Component of Any Congressional Request for Documents

The district court's opinion puts the cart before the horse by first holding that President Biden's refusal to exert executive privilege is dispositive with respect to privilege and then applying the wrong test regarding the constitutionality of congressional requests. JA 193-204. Before and apart from any discussion of executive privilege, all congressional requests must comply with the Constitution, regardless of the dictates of the incumbent president. *Mazars*, 140 S. Ct. at 2035. The court may only consider questions of executive privilege after it has determined that a congressional request serves a valid legislative purpose. *Id.*

When Congress seeks a person's information or documents, the person whose information will be exposed may sue in federal court for an "injunction or declaratory judgment." *U.S. Servicemen's Fund v. Eastland*, 488

F.2d 1252, 1259 (D.C. Cir. 1973). A "valid legislative purpose," articulating a "'specific need' for the . . . information," must support all congressional information requests. *Mazars,* 140 S. Ct. at 2032 (quoting *Nixon*, 418 U.S. at 713).

The "valid legislative purpose" requirement stems directly from the Constitution. *Kilbourn*, 103 U.S. at 182–89. "The powers of Congress . . . are dependent solely on the Constitution," and "no express power in that instrument" allows Congress to investigate individuals or to issue boundless records requests. *Id*. The Constitution instead permits Congress to enact certain kinds of legislation, *see, e.g.*, U.S. CONST. art. I, § 8, and Congress's power to investigate "is justified solely as an adjunct to the legislative process." *Watkins v. United States*, 354 U.S. 178, 197 (1957). Just as

Rather than respecting these important constitutional mandates, the district court adopted the wrong test for determining whether a congressional request serves a valid legislative purpose. First, the district court erred by claiming that a congressional request is valid if it concerns topics on which legislation "could be had." JA 204. The Supreme Court

soundly rejected this argument barely a year ago. *Mazars*, 140 S. Ct. at 2034 (rejecting Congress's approach because it aggravated separation of powers principles by eschewing any limits on the power to subpoena presidential records). The lower court's claim that "Congress need not . . . identify specific legislation within the context of a request for documents or testimony" is also wrong. Opinion at 28. The Committee must "adequately identif[y] [its] aims and explain[] why the President's information will advance its consideration of the possible legislation." *Mazars*, 140 S. Ct. at 2036, and its failure to do so here is fatal to its request. The lower court's citation of *McGrain v. Daugherty*, 273 U.S. 135, 161 (1927), *see* JA 204, is unavailing, as the Supreme Court's decision in *Mazars* is binding and clearly instructive on this issue.

Next, the court erred by claiming that the incumbent President's privilege determination could somehow legitimize the Committee's fishing expedition. JA 207. There is no precedent for such a holding, which would give incumbent Presidents the unprecedented power to validate or invalidate congressional requests that serve no legitimate legislative

purposes simply by waiving or claiming privilege. This offends the separation of powers and is inconsistent with Supreme Court precedent.

In Congress's request, Chairman Thompson claims the purpose of his request is to investigate the facts, circumstances, and causes of the events of January 6, 2021. JA 33. Chairman Thompson, however, fails to identify anything in the privileged communications that could advance or inform any legitimate *legislative* purpose.

Finally, the Committee's request has an improper law enforcement purpose and is thus invalid. Congress may not issue a request for the purpose of "law enforcement," *Quinn*, 349 U. S., at 161, and this request plainly seeks to "try" President Trump "for . . . wrongdoing." *McGrain*, 273 U. S. at 179. Contrary to Appellee's assertion, moreover, President Trump does not complain of the request because it might disclose some wrongdoing, as such wrongdoing never occurred. Rather, the request's abject failure to identify proposed legislation and why the President's information will advance such legislation are evidence that the Committee's request has an improper law enforcement purpose and that its fundamental

nature is plainly for law enforcement purposes. Congress is not "a law enforcement or trial agency," and congressional investigations conducted "for the personal aggrandizement of the investigators" or "to punish those investigated" are "indefensible." *Watkins*, 354 U.S. at 187 (cleaned up). Finally, any investigation into alleged claims of wrongdoing is a quintessential law-enforcement task reserved to the executive and judicial branches. Congress is not a law-enforcement branch of government; it cannot seek information "for the sake of exposure." *Watkins,* 354 U.S. at 200.

### b. All Four Mazars Factors Confirm the Request Serves No Valid Legislative Purpose in the Context of a Request Targeted at the Executive Branch.

Any Congressional request must articulate a valid legislative purpose, but when Congress seeks the most sensitive, privileged presidential records, like those requested here, its burden is even heavier, because it is intruding on a co-equal branch of government in a manner that affects the balance and separation of powers. It must affirmatively show the requested documents are "demonstrably critical to the responsible fulfillment of the Committee's

functions." *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974).

The Committee has failed to meet these "demanding standards," while boldly requesting presidential communications, including "Oval Office communications over which the President asserted executive privilege." *Mazars,* 140 S. Ct. at 2031–32. In this case, the lower court itself even described the request as "unbelievably broad" at oral argument, and opposing counsel similarly admitted that the request was "broad." JA 257. These admissions should doom the request, and, at minimum, counsel in favor of granting the requested relief here, given the weighty issues at stake.

These serious constitutional clashes are rarely litigated, but recently the Supreme Court had cause to address the constitutionality of closely related congressional records requests, and it provided four "special considerations" meant to guide a court's "careful analysis" in this delicate realm. *Mazars,* 140 S. Ct. at 2035. These factors take "adequate account of the separation of powers principles at stake, including both the significant

legislative interests of Congress and the unique position of the President." *Id*. at 2035.

The first *Mazars* factor is "whether the asserted legislative purpose warrants the significant step of involving the President and his papers." *Id.* at 2035 (internal quotations omitted); second, requires courts to "insist on a subpoena no broader than reasonably necessary to support Congress's legislative objective," *id.* at 2036; third, "courts should be attentive to the nature of the evidence offered by Congress to establish that a [request] advances a valid legislative purpose," *id.*; and fourth, courts should assess the burdens imposed by the request because the records stem from a rival political branch with incentives to use the records requests for "institutional advantage." *Id.* When the facts of this case are analyzed under the *Mazars* factors, they confirm the abusive, wide-ranging request here serves no legitimate legislative purpose and does violence to our tri-partite structure of our government.

The district court's cursory analysis of the four *Mazars* factors guts them. JA 209-210. As discussed above, under the first *Mazars* factor, the

lower court ignored the significant separation of powers concerns associated with a congressional request for a President's materials. This was error.

This was error. In addition, the request's "particular legislative objective" must "warrant[] the significant step of involving the President and his papers." *Mazars*, 140 S. Ct. at 2035. Here, the Committee has failed to adequately explain any actual proposed legislation, much less why such legislation would warrant the release of the requested records. Further, "[u]nlike in criminal proceedings, where the very integrity of the judicial system would be undermined without full disclosure of all the facts, efforts to craft legislation involve predictive policy judgments that are not hampered . . . in quite the same way when every scrap of potentially relevant evidence is not available." *Mazars*, 140 S. Ct. at 2035 (cleaned up). The Committee has mountains of evidence regarding the events of January 6th, and additional, privileged records are not needed for the Committee to legislate.

The Committee has also never explained why other sources of information—outside of the requested records—could not "reasonably

provide Congress the information it needs in light of its particular legislative objective." *Id.* at 2035-36. Moreover, "[t]he President's unique constitutional position means that Congress may not look to him as a 'case study' for general legislation." *Id.* at 2036. Chairman Thompson's request openly flouts this rule by admitting that the Committee's request seeks to "identify lessons learned, and recommend laws, policies, procedures, rules, or regulations necessary . . . in the future," effectively treating President Trump as a test subject. JA 33.

The district court's most egregious error, however, involved the second *Mazars* factor, where the court claimed that because President Biden has refused to assert executive privilege, the request is not overly broad. JA 210. The Supreme Court has held that requests must be "no broader than reasonably necessary to support Congress's legislative objective." *See Mazars*, 140 S. Ct. at 2036. "The specificity of the subpoena's request 'serves as an important safeguard against unnecessary intrusion into the operation of the Office of the President.'" *Id.* (quoting *Cheney v. U.S. Dist. Court*, 542 U.S. 367, 387 (2004)). This is a constitutional limitation that stems from the

important boundaries between the Branches. All congressional requests must comply with the Constitution, regardless of what the incumbent President dictates, and this request plainly fails to do so.

Indeed, there is nothing reasonable about the scope of the Committee's request, which lacks specificity by any measure and seeks every presidential record and communication that could tenuously relate to events that occurred on January 6, 2020, in Washington, D.C. Even worse, in some instances there is no reasonable connection between the records requested and the events of January 6th. For example, the request asks for "[a]ll documents and communications within the White House on January 6, 2021, relating in any way to . . . the January 6, 2021 rally . . . Donald J. Trump" and over thirty other individuals and government agencies. JA 35. Indeed, the request could reasonably be read to include every single e-mail or document created, sent, or received in the White House on that day. Thus, the second *Mazars* factors weighs against finding that the request has a valid legislative purpose.

Third, "courts should be attentive to the nature of the evidence offered by Congress to establish that a [request] advances a valid legislative purpose." *Mazars*, 140 S. Ct. at 2036. "[U]nless Congress adequately identifies its aims and explains why the President's information will advance its consideration of possible legislation," "it is impossible to conclude that a [request] is designed to advance a valid legislative purpose." *Id.* The Committee has provided no evidence to establish that its request advances a legitimate legislative purpose. Indeed, House Resolution 503 generally permits the Committee to investigate intelligence community and law enforcement activities surrounding January 6th but is silent regarding the records and materials of the Executive Office of the President. The lack of evidence establishing that the Committee's overbroad request serves some legitimate legislative goal dooms the request and weighs in favor of granting a preliminary injunction here." *Id.* (citing *Watkins*, 354 U.S. at 201, 205).

Fourth, courts should "assess the burdens imposed on the President by [the request]" because "[the burdens] stem from a rival political branch that has an ongoing relationship with the President and incentives to use

[requests] for institutional advantage." *Id.* As discussed above, the number of records encompassed by the Committee's overbroad request is staggering. Further, the limited time-period to review potentially responsive documents adds to the burden of the request. The Committee must narrow its request significantly or the burden on President Trump in reviewing all potentially responsive documents within the period provided by the PRA will be substantial. The request also burdens the presidency generally in the sense that if Congress is permitted to issue such sweeping requests, every President's close aides will fear disclosure and thus provide less than candid advice. "Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process." *Nixon*, 418 U.S. at 705. This chilling effect will harm every President. Permitting these types of requests will also burden every former President going forward, as partisans in Congress will seek to relitigate past grievances perpetually. Thus, this factor weighs in favor of granting a preliminary injunction in this instance.

Even under the "*Mazars* lite" test, fashioned by the district court to consider a subpoena's effect on a President no longer in office, the request at issue here is invalid. *See generally Trump v. Mazars USA LLP*, 2021 WL 3602683 (D.D.C. Aug. 11, 2021). There, the court held that even when dealing with requests for documents related to a non-incumbent President, Congress must still show how the requested documents will "uniquely advance its legislative objectives." *Id.* at 16. An "undeniably broad" records request like the one at issue here will still be invalid. *Id.* at *17. "The more Congress can invade the personal sphere of a former President, the greater the leverage Congress would have on a sitting President." *Id.* (citing *Mazars*, 140 S. Ct. at 2036).

While President Trump does not endorse the *Mazars* lite test, the court's rationale in its recent decision supports finding the incredibly broad request in this case constitutionally defective. The Committee has failed to explain how the requested materials would uniquely advance its legislative objectives, and the request is wide-ranging and broader than any

congressional request in modern history. Thus, the request fails even the *Mazars* lite test.

Finally, before the district court, the Committee claimed that its investigation may yield recommendations as to whether and how Congress should pass legislation to revise the mechanics of the electoral counting and other potential legislation. But the Committee fails to explain how "the President's information will advance its consideration of [any] possible legislation." *Mazars*, 140 S. Ct. at 2035. There is no reason why Congress would need the sheer level of detail about the President's or his close advisors' daily activities that the request demands just to enact legislation regarding how Congress counts electoral votes. The Committee has also claimed that Congress may wish to enhance the legal consequences for any dereliction of duty by a President. But Congress can already pass such legislation today, without the requested information, and is not permitted to investigate the President as a "case study" for general legislation. *Mazars*, 140 S. Ct. at 2035. Further, many of the Committee's requests seek records that do not involve the President or the disputed events of January 6 at all.

### c. The Committee Lacks Express Authority by Congress to Issue this Request

The district court never addressed President Trump's argument that Congress has not authorized the Committee to issue requests for a former President's presidential records. This argument alone provides a basis to invalidate the Committee's request. "Congressional committees are themselves the offspring of Congress; they have only those powers authorized by law; they do not have an unlimited roving commission merely by virtue of their creation and existence to ferret out evil or to uncover inequity." *In re Beef Indus. Antitrust Litig.*, 589 F.2d 786, 787-88 (5th Cir. 1979). Hence, congressional committees "must conform strictly to the resolution establishing [their] investigatory powers" for a request to be statutorily valid. *Exxon Corp. v. FTC*, 589 F.2d 582, 592 (D.C. Cir. 1978); *see also Watkins*, 354 U.S. at 201.

H. Res. 503 does not permit the Committee to request presidential records; it never even mentions the President, the EOP, presidential records, any advisors to the President, or the Archivist. JA 92-105. The absence of an express statement authorizing or even contemplating the Committee's

request here should be decisive. "The theory of a committee inquiry is that the committee members are serving as the representatives of the parent assembly in collecting information for a legislative purpose." *Watkins*, 354 U.S. at 200. Congress must "spell out that group's jurisdiction and purpose with sufficient particularity . . . in the authorizing resolution," which "is the committee's charter." *Id*. at 201. Nothing authorizes the Committee's sweeping request here, and it should be invalidated.

### d. The Request Violates the PRA and Associated Regulations

Chairman Thompson's request runs afoul of the statutory and regulatory requirements for a congressional records request under the Presidential Records Act, which mirror the constitutional requirements. Presidential records "shall be made available . . . (C) to either House of Congress, or, to the extent . . . within its jurisdiction, to any committee or subcommittee thereof if such records contain information…needed for the conduct of its business and…not otherwise available." 44 U.S.C. § 2205(2)(C) (emphasis added). The regulations governing NARA have the same requirements. 36 C.F.R. § 1270.44 (2002).

In adopting the Presidential Records Act, Congress put limits on its own authority to obtain presidential records. 44 U.S.C. § 2205(2)(C). That provision specifically limits presidential record requests to information "needed for the conduct of [congressional or committee] business and that is not otherwise available." *Id.*[3] Of course, Congress also specifically recognized a former President's standing to challenge such a records request. 44 U.S.C. § 2204(e). The district court, however, skipped over this analysis and failed to determine whether the records requests satisfied the PRA. Consequently, even if the Committee's request did not offend the separation of powers concerns underlying *Mazars,* it failed to satisfy the statutory limitations in the PRA and its associated regulations.

### e.  The Requested Documents are Privileged

Legal privileges protect the requested records and thus should not be produced to the Committee. President Trump has already reviewed and identified a handful of documents allegedly responsive to the Committee's

---

[3] 36 C.F.R. § 1270.44 (2002) contains an identical limitation on such requests.

request in the first three sets of documents provided by the Archivist and clearly protected by the presidential communications privilege, among others. But President Biden is attempting to waive the executive privilege of his predecessor, without any legal basis for doing so. Indeed, the Biden Administration does not even attempt to argue that President Trump improperly designated the records at issue as being protected by executive privilege. Additionally, while the executive privilege is qualified, it can only be invaded pursuant to a demonstrated and specific showing of need, not a broad and limitless waiver, executed pursuant to political calculations. *See Nixon*, 418 U.S. at 713. Importantly, the incumbent President's duties under the Constitution, the PRA, and its associated regulations are limited to disputes whether the former President validly asserted executive privilege.

"The presidential communications privilege . . . extends 'beyond communications directly involving and documents actually viewed by the President, to the communications and documents of the President's immediate White House advisors and their staffs,'" i.e., documents "'solicited and received' by the President or his immediate White House

advisors who have 'broad and significant responsibility for investigating and formulating the advice to be given the President.'" *Judicial Watch, Inc. v. Dept. of Justice*, 365 F.3d 1108, 1114 (D.C. Cir. 2004) (quoting *In re Sealed Case*, 121 F.3d 729, 742 (D.C. Cir. 1997)). "Human experience teaches that those who expect public dissemination of their remarks may well temper candor with a concern for appearances and for their own interests to the detriment of the decisionmaking process." *Nixon*, 418 U.S. at 705.

Executive privilege survives a President's term of office. *GSA*, 433 U.S. at 439 (holding that a former President has standing to assert executive privilege). The confidentiality necessary to ensure full and frank advice cannot be measured by "a few months or years between the submission of the information and the end of the President's tenure." *Id.* at 449. Here, President Trump's term of office expired less than a year ago. A dispute between incumbent and former Presidents regarding the privileged nature of the latter's presidential records is subject to judicial review. *See GSA,* at 39; 44 U.S.C. § 2204(e).

It is important to note that President Trump's invocation of privilege can be upheld on the basis of *GSA*, alone, in which the Supreme Court confirmed that a former President retains executive privilege at least with respect to confidential communications, and that he can assert that privilege in court even over the objections of the incumbent President. 433 U.S. at 447–49 (adopting the Solicitor General's view that executive privilege "is not for the benefit of the President as an individual, but for the benefit of the Republic [, and t]herefore the privilege survives the individual President's tenure").

In deciding whether to uphold a former President's assertion of privilege, the Supreme Court has placed a premium on the question of whether the records at issue would remain protected from public disclosure. In *Nixon,* the Court allowed the records at issue to be reviewed *in camera* by a district court. 418 U.S. at 706. Likewise, in *GSA* the Court allowed records to be produced to an archivist, pursuant to a statutory scheme that was the precursor to the PRA, only when the records were subject to access

restrictions established to ensure that executive confidentiality would be maintained. *GSA,* 433 U.S. at 450-51.

When the PRA gives the former President the right to uphold or not uphold a claim of executive privilege, it mirrors *GSA*'s articulation of what a former President can and cannot do. A former president retains the right to assert the presidential communications privilege, but not the state secrets form of executive privilege. *See GSA,* 433 U.S. at 447–49 (noting President Nixon's concession that former Presidents may not assert the state-secrets privilege). The reason for this distinction is straightforward—the former president is likely best situated to know if disclosure of documents from his tenure will harm the public interest, while the incumbent president is more likely to know which state secrets need to be protected.

The incumbent is also poorly suited to resolve the dispute. Quoting James Madison, the Supreme Court has been clear: "No man is allowed to be a judge in his own cause." *Guitierrez de Martinez v. Lamagno*, 515 U.S. 417, 428 (1995) (quoting *The Federalist No. 10,*p. 79 (C. Rossiter ed. 1961) (J. Madison)). Yet, absent judicial review on a document-by-document basis,

this dispute will be determined by a party rather than a neutral arbiter. Each record in dispute raises its own unique constitutional question. The Court cannot abdicate its role in resolving this dispute by deferring to the incumbent's unfettered discretion.

The district court boldly asserts that the records at issue are not privileged. JA 209. Not even the Executive Branch Appellees made such a claim. The documents were created during President Trump's term of office and reflect presidential decisionmaking, deliberations, and communications among close advisors, attorneys, and the President. There is no question that the records at issue reflect presidential communications and the deliberative process of Presidential advisers. They are presumptively privileged.

Binding precedent confirms President Trump may assert executive privilege and other privileges over materials requested by Congress. *See GSA*, 433 U.S. at 449 (1977). The "privilege survives the individual President's tenure." *GSA*, 433 U.S. at 439. "[T]he remaining separation of powers concern at issue [with former Presidents] involves the threat of a post-presidency congressional subpoena for personal information in order

to influence 'how the sitting President treats Congress while in office.'" *Mazars*, 2021 WL 3602683, at *17. President Trump is entitled to withhold the records at issue from production to the Committee pursuant to executive privilege.

The district court erred by ignoring the plain statements in *GSA* that President Trump possesses the right to be heard on his executive privilege claims. *See GSA*, 433 U.S. at 439. The Supreme Court in *GSA* has made clear that executive privilege survives the President's term of office, which benefits our Republic. *Id.* This Court should refuse to ignore *GSA*'s straightforward holding and find that President Trump can assert executive privilege here.

Oddly, the lower court relied on *Dellums v. Powell*, 561 F.2d 242, 247 (D.C. Cir. 1977), a case that was decided before *GSA*, to reach its decision. This reliance was error. And the lower court's claim that its reading of the PRA to give incumbent presidents unilateral power over executive privilege decisions is consistent with *GSA*, is stunning. *GSA* plainly contemplates that

all presidents have the power to exert executive privilege. Thus, the district court's decision should be reversed.

**f. The rule advocated by Appellees and adopted by the district court would undermine the separation of powers and eviscerate executive privilege.**

The district court held that "Presidents are not kings." JA 194. True, but in that same vein, Congress is not Parliament—a legislative body with supreme and unchecked constitutional power over the operations of government. *See Dep't of Transp. v. Ass'n of Am. Railroads,* 575 U.S. 43, 74-75 (2015) (discussing the founders' rejection of parliamentary supremacy in favor of requiring that Congress must be subject to law); *Mazars*, 140 S. Ct. at 2045 (Thomas, J., dissenting). The founders chose to restrain congressional authority to specifically delineated powers. U.S. CONST. Art. 1, § 1, cl. 1. If the Committee's request is upheld, there would be no limitation on the presidential records Congress could review. In *Mazars*, the Supreme Court squarely rejected the argument that Congress has unfettered discretion to seek presidential records and limited Congress's

authority to inquiries that serve a valid legislative purpose. *Mazars*, 140 S. Ct. at 2034–35.

Here, Congress argued, and the district court found, that the only limiting principle required is that legislation could theoretically be had on the issues of safety and election integrity. JA 204. The district court's finding is inapposite to the Supreme Court's holding in *Mazars*. 140 S. Ct. at 2034. Notwithstanding controlling precedent, if this Court accepts the Defendant's arguments, and the district court's finding, that congressional investigatory authority is limited only where legislation could not be theoretically had, Congress could review any and every document from any executive or judicial office or officer at any time.

Likewise, under the district court's "theoretical" test Congress could obtain information from any corner of the federal government to investigate past or present federal spending or future funding decisions for any part of the federal government. For example, administrative agencies are creations of Congress, giving Congress purview of legislative modification to any facet of the agencies. In the same way any of the district and circuit courts fall squarely into Congress's legislative purview. U.S. CONST. art. III, § 1 ("The Judicial Power of the United States, shall be vested

in one supreme Court, and in such inferior courts as the Congress may from time to time establish."). Even the documents of the Supreme Court could fall within these bounds if Congress *could* theoretically use them to determine, for example, whether to limit the bounds of lower federal court jurisdiction to expand the bounds—and workload—of the Supreme Court.

Adopting the district court's novel rule would allow Congress to give itself the power to investigate and undermine the authority of both the Executive Branch and Judicial Branch of the federal government. This would upend any notion of separate and co-equal branches of government. Further, the "theoretical" test would allow Congress, the most political branch, unfettered access to presidential records whenever the same party is in control of the Executive and Legislative branches. This would undoubtedly gut the executive privilege. If every aide to the President must be concerned about their advice becoming public record, the very purpose of the executive privilege would be destroyed.

More specifically, the Committee's rationale would destroy the traditional limitations on Congress's ability to request documents especially

under the PRA. Under their test, Congress would be able to gather up almost any document in existence that references any part of the government or that is regulated by Congress or, logically at its broadest, *could* be regulated by Congress. When combined with Congress's Spending Powers and the fact congressional legislation is required to authorize and appropriate every single federal dollar spent—*or that might or could be spent*—by any branch or department or agency or office of the federal government, there is virtually, if not literally, nothing under the sun that Congress could not request by the Committee's and the lower court's standard. In this age, there is essentially no document that does not directly, let alone tangentially, relate to the functioning of, or is under the regulation of or *could* be under the regulation of, or is spent by or funded by or *could* be spent or funded by, some part of the federal government. There would be no judicially manageable standard for removing anything from the purview of Congressional review and investigation.

This is particularly relevant to the Committee's overbroad requests at issue here. The Committee has admitted that their request is overbroad,

albeit only after the Court admonished them directly for their "unbelievably overbroad" requests including documents pertaining to President Trump's Campaign reaching back to April of 2020. JA 257. Instead of limiting or withdrawing these overly broad requests, however, the Committee is relying on the courts to blue-pencil them into compliance. That is an invitation that should be flatly rejected by the Court.

Should Congress be allowed to serve overly broad requests for presidential records knowing that the courts will use their discretion to limit the requests after the fact, and only after litigation has commenced, then it will be incentivized to continue making increasingly broad requests, knowing that it can rely on the courts to limit them (or not) later. Instead, the Constitution requires that congressional requests be limited to a specific legislative purpose from the start. *Mazars,* 140 S. Ct. at 2036.

The result of adopting the district court's analysis is more than a hypothetical parade of horribles; it will have a direct and immediate impact on the advice given to presidents, from President Biden and all those that follow him. Indeed, these concerns are at the very heart of the President's

executive privilege. For instance, the requests seek records of political records going back to April 2020, during the height of the first wave of the COVID-19 pandemic. A President's need to receive full, frank, and confidential advice from his advisers is at its apex during times of crisis, like a worldwide pandemic.

Further, the requests include records of all White House communications on January 6th related in any way to, among an array of others, Donald J. Trump. JA 34-44. Of course, any request for White House records in any way relating to the sitting President of the United States is the very definition of overbreadth; inevitably it will make every communication sent or received that day responsive, regardless of whether it concerned his speech at the Ellipse or complex and sensitive matters of foreign affairs.

In all, there are over 60 individual requests contained in the Committee's request, not including subparts. The Appellees do not (and cannot) assert that they are narrowly tailored. Instead, they are as broad as they are supercilious. If this Court were to accept the rationale of the district court, it would lead to the erosion and eventual destruction both of the

separation of powers concerns underlying *Mazars* and executive privilege. In their place, Congress would be vested with an unprecedented—and unconstitutional—power of inquisition.

### g. Allowing an Incumbent President Carte Blanche Authority to Waive the Privilege of his Predecessor Would Render the PRA Unconstitutional

If the PRA is read to allow an incumbent President unfettered discretion to waive former Presidents' executive privilege, it would render the law unconstitutional. Executive privilege is rooted in the Constitution and "safeguards the public interest in candid, confidential deliberations within the Executive Branch; it is fundamental to the 'operation of Government.'" *Mazars*, 140 S. Ct. at 2032 (quoting *Nixon*, 418 U.S. at 708). If the incumbent President could waive the full extent of the constitutionally based executive privilege without judicial review, every President, cabinet official, and advisor would be hamstrung by the knowledge that a subsequent President from a rival political party could simply waive privilege and expose confidential executive communications to the world.

Indeed, Congress specifically recognized that nothing in the PRA "shall be construed to confirm, limit, or expand any constitutionally-based privilege which may be available to an incumbent or former President." 44 U.S.C. § 2204(c)(2).

## II.   Irreparable Harm

Both Congress and the Supreme Court have specifically recognized the rights of former Presidents to challenge the production of privileged presidential records. *See* 44 U.S.C. § 2204; *GSA*, 433 U.S. at 439. The executive branch also recognized that right to bring such an action through the promulgation of regulations. 36 C.F.R. § 1270.44. The Supreme Court specifically held that former Presidents have rights to assert executive privilege. *GSA*, 433 U.S. at 439. In other words, all three branches have spoken clearly, a former President may challenge an invasion of executive privilege and the release of his presidential records. The district court's finding that President Trump lacked irreparable harm is simply a backdoor attempt to negate this clear right and recognized cause of action. Because

Appellees seek to invade that right rooted by statute and the Constitution, Appellant will be irreparably harmed, absent an injunction.

Moreover, the district court was legally incorrect when it suggested that President Trump's standing was no greater than an ordinary citizen. JA 190 (holding that executive privilege "can neither be claimed nor waived by a private party." JA 190 (*citing United States v. Reynolds*, 345 U.S. 1, 7 (1953)). Instead, he is one of only five living Americans who, as former Presidents, are entrusted with protecting the records and communications created during their term of office. The Supreme Court, the Presidential Records Act, its associated regulations, and Executive Order 13489 are clear: a former President is not merely a "private party." Instead, he has the right to be heard and to seek judicial intervention should a disagreement between the incumbent and former Presidents arise regarding congressional requests and executive privilege.

Moreover, the district court's contention that "it is not this court's role to decide whether Congress is motivated to aid legislation or to exact political retribution" is plainly wrong. JA 202. This political clash is likely

why the Supreme Court provided former Presidents a right to assert executive privilege. Congress's motivations are at the heart of the test developed in *Mazars.* They are precisely why *GSA*, 433 U.S at 449, grants the former President the "right to be heard," and why the PRA allows former Presidents a judicial remedy. 44 U.S.C. § 2204; *see also* 36 C.F.R. § 1270.44 (stating the Archivist discloses records after incumbent denial of the privilege only if no court order is issued). The court cannot be so cavalier in shirking its responsibility and abrogating the law.

Certainly, the disclosure of the documents themselves also constitutes irreparable harm.  If the Court does not intervene, the Archivist could give the Committee confidential, privileged information. Once disclosed, the information loses its confidential and privileged nature. *See Council on American-Islamic Relations v. Gaubatz*, 667 F. Supp. 2d 67, 76 (D.D.C. 2009). If such material is disclosed before President Trump has had a proper opportunity for appellate review, "the very right sought to be protected has been destroyed." *In re Sealed Case No. 98-3077*, 151 F.3d 1059, 1065 (D.C. Cir. 1998) (quoting *In re Ford Motor Co.*, 110 F.3d 954, 963 (3d Cir. 1997)); s*ee also*

*Providence Journal Co. v. FBI*, 595 F.2d 889, 890 (1st Cir. 1979) ("Once the documents are surrendered," in other words, "confidentiality will be lost for all time. The *status quo* could never be restored."); *PepsiCo, Inc. v. Redmond*, 1996 WL 3965, at *30 (N.D. Ill. 1996) ("[J]ust as it is impossible to unring a bell, once disclosed, . . . confidential information lose[s] [its] secrecy forever"); *Metro. Life Ins. Co. v. Usery*, 426 F. Supp. 150, 172 (D.D.C. 1976) ("Once disclosed, such information would lose its confidentiality forever.").

President Trump personally relied on the expectation of executive confidentiality while in office, the time when the communications and records at issue were created. The attempted destruction of those rights by Defendants is personal to him. Moreover, the incumbent President, who lacks context and information concerning the documents in question, cannot fairly evaluate President Trump's rights.

### III.   Balance of Equities and Public Interest

The balance of equities and public interest also favor granting President Trump's Motion. "These factors merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Initially, it is

always equitable and in the public interest to enforce the Constitution. *Gordon v. Holder,* 721 F.3d 638, 653 (2013). The D.C. Circuit "has clearly articulated that the public has an interest in the government maintaining procedures that comply with constitutional requirements." *Ass'n of Cmty. Orgs. for Reform Now (ACORN) v. FEMA*, 463 F. Supp. 2d 26, 36 (D.D.C. 2006) (citing *O'Donnell Const. Co. v. Dist. of Columbia*, 963 F.2d 420, 429 (D.C. Cir. 1992)). The Constitution entrusts the courts to determine whether the Committee has exceeded its constitutional authority. Denying President Trump's Motion would "abdicate the responsibility placed by the Constitution upon the judiciary to ensure that the Congress" has not acted illegitimately in issuing this request for privileged information by effectively denying appeal. *Watkins*, 354 U.S. at 198–99. Permitting the Committee to evade judicial review is not in the public interest.

Unlike the irreparable harm President Trump will suffer absent interim relief, Defendants would suffer no harm by delaying production while the parties litigate the request's validity. There will not be another

Presidential transition for more than three years; Congress has time to allow the courts to consider this expedited appeal while it continues to legislate.

In addition, the records sought are in the custody and control of NARA and therefore are being preserved as a matter of law. The Committee's "interest in receiving the records immediately" thus "poses no threat of irreparable harm to them." *Shapiro v. U.S. Dep't of Justice*, 2016 WL 3023980, at *7 (D.D.C. May 25, 2016). Interim relief only "postpones the moment of disclosure . . . by whatever period of time may be required" to adjudicate the merits of President Trump's claims finally. *Providence Journal*, 595 F.2d at 890; *see Fund for Animals v. Norton*, 281 F. Supp. 2d 209, 222 (D.D.C. 2003) (rejecting the government's claim of harm in having its action "delayed for a short period of time pending resolution of this case on the merits"). The limited interest the Committee may have in immediately obtaining the requested records pales in comparison to President Trump's interest in securing judicial review before he suffers irreparable harm.

# CONCLUSION

For the foregoing reasons, the decision of the district court should be reversed, and this matter should be remanded with instructions for the district court to grant President Trump's Motion for a Preliminary Injunction.


Dated: November 16, 2021                    Respectfully submitted,

                                            /s/ Jesse R. Binnall
                                            Jesse R. Binnall (VA022)
                                            BINNALL LAW GROUP, PLLC
                                            717 King Street, Suite 200
                                            Alexandria, VA 22314
                                            Tel: (703) 888-1943
                                            Fax: (703) 888-1930
                                            jesse@binnall.com

                                            Justin R. Clark
                                            ELECTIONS, LLC
                                            1050 Connecticut Avenue, NE,
                                            Suite 500
                                            Washington, D.C. 20036
                                            (202) 987-9944
                                            justin.clark@electionlawllc.com

                                            *Counsel for Donald J. Trump*

# CERTIFICATE OF COMPLIANCE

Undersigned counsel certifies that this Petition complies with the type-volume limitation of Federal Rule of Appellate Procedure 5(c)(1) because, excluding the parts of the Petition exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1), it contains 9,557 words.

Undersigned counsel certifies that this Petition complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Palatino Linotype.

Dated: November 16, 2021                    Respectfully submitted,

/s/ Jesse R. Binnall
Jesse R. Binnall (VA022)
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, VA 22314
Tel: (703) 888-1943
Fax: (703) 888-1930
jesse@binnall.com

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was filed with the Clerk of the
Court using the Court's CM/ECF system, which will send a copy to all
counsel of record.

Dated: November 16, 2021
Respectfully submitted,

/s/ Jesse R. Binnall
Jesse R. Binnall (VA022)
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, VA 22314
Tel: (703) 888-1943
Fax: (703) 888-1930
jesse@binnall.com

*Counsel for Donald J. Trump*