IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

DONALD J. TRUMP, in his capacity as
The 45th President of the United States,

*Plaintiff-Appellant,*

v.

BENNIE G. THOMPSON, in his official capacity as Chairman of the United States
House Select Committee to Investigate the January 6th Attack on the United States
Capitol; THE UNITED STATES HOUSE SELECT COMMITTEE TO INVESTIGATE
THE JANUARY 6th ATTACK ON THE UNITED STATES CAPITOL; DAVID S.
FERRIERO, in his official capacity as Archivist of the United States; and THE
NATIONAL ARCHIVES AND RECORDS ADMINISTRATION,

*Defendant-Appellees.*

———————————

On Appeal from the United States District Court
for the District of Columbia

———————————

REPLY OF APPELLANT

———————————

Jesse R. Binnall
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, VA 22314
Tel: (703) 888-1943
Fax: (703) 888-1930
jesse@binnall.com

Justin R. Clark
ELECTIONS, LLC
1050 Connecticut Avenue, NE, Suite 500
Washington, D.C. 20036
(202) 987-9944
justin.clark@electionlawllc.com

**COUNSEL FOR PRESIDENT DONALD J. TRUMP**

# TABLE OF CONTENTS

TABLE OF CONTENTS........................................................................................................ ii

TABLE OF AUTHORITIES ............................................................................................... iii

GLOSSARY......................................................................................................................... vi

INTRODUCTION AND SUMMARY OF ARGUMENT.....................................................1

ARGUMENT ........................................................................................................................3

    I.    The Decision of the District Court is Reviewed De Novo…….………………………..3

    II.    The Basis Underlying Appellees Attempted Invasion of Executive Privilege and Confidentiality is Premised on False Partisan Allegations and Media Bluster Regarding January 6th …………………………………………………………………….5

    III.    President Trump is Likely to Succeed in Showing that the Presidential Records at Issue are Protected from Production by Statute and the Constitution……………….9

        a.    The Presidential Records Act dispositively resolves this dispute……………….9

        b.    The records at issue must be reviewed individually…………………………….13

        c.    Serious separation-of-powers concerns regarding Congress' access to presidential records survive a President's term of office and prohibit the production sought by Congress……………………………………………………17

            1.    The Committee Failed to Articulate a Legitimate Legislative Purpose for it Request …………………………………………………………………………17

            2.    Appellee's have it backwards, they are required to first try and obtain this information elsewhere.………………………………………………………...27

        d.    Appellee's attempt to undermine executive privilege is constitutionally infirm …………………………………………………………………………………28

        e.    The requested records are privileged …………………………………………..33

CONCLUSION....................................................................................................................34

CERTIFICATE OF COMPLIANCE...................................................................................37

CERTIFICATE OF SERVICE............................................................................................38

# TABLE OF AUTHORITIES

**Cases**

*Armstrong v. Exec. Office of the President*,
   97 F.3d 575, 580 (D.C. Cir. 1996) ...................................................... 15

*Connection Dist. Co. v. Reno*,
   154 F.3d 281, 288 (6th Cir. 1998) ....................................................... 5

*Guedes v. ATF*,
   920 F.3d 1, 10 (D.C. Cir. 2019) .......................................................... 3

*Machin v. Zuckert*,
   316 F.2d 336 (D.C. Cir. 1963) ........................................................... 10

*McPhaul v. United States*,
   364 U.S. 372, 381-82 (1960) ............................................................. 23

\* *Nixon v. Adm'r of Gen. Servs. ("GSA")*,
   433 U.S. 425, 449 (1977) ............................................................ passim

*Protect Democracy Project, Inc. v. U.S. Nat'l Sec. Agency*,
   443 F. Supp. 3d 1, 6 (D.D.C. 2020) .................................................. 15

*Ray v. Turner*,
   587 F.2d 1187 (D.C. Cir. 1978) ......................................................... 15

*Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725,
   732 (D.C. Cir. 1974) ......................................................................... 20

*Shelton v. United States*,
   404 F.2d 1292, 1297 (D.C. Cir. 1968) .............................................. 23

\* *Trump v. Mazars USA, LLP*,
   140 S. Ct. 2019 (2020) .............................................................. passim

*Trump v. Mazars, USA, LLP,*
940 F.3d 710, 728 (D.C. Cir. 2019) ................................................................ 20

\* *United States v. Nixon,*
418 U.S. 683 (1974) ........................................................ 15, 24, 33

*Watkins v. United States,*
354 U.S. 178, 197, 187 (1957) ........................................................ 23

**Statutes**

\* 44 U.S.C. § 2204 ........................................................ 11

\* 44 U.S.C. § 2205 ........................................................ 4, 11

**Other Authorities**

Late Night with Seth Meyers, *Rep. Adam Schiff Says It Was Torture Listening
to Kevin McCarthy's Speech,* YouTube (Nov. 22, 2021),
https://www.youtube.com/watch?v=mPvKNFC615o ................................ 26

Mark Hosenball and Sarah N. Lynch, *Exclusive: FBI finds scant evidence U.S.
Capitol attack was coordinated –sources,* REUTERS, Aug. 20, 2021,
https://www.reuters.com/world/us/exclusive-fbi-finds-scant-evidence-us-
capitol-attack-was-coordinated-sources-2021-08-20/ ................................ 33

Staff Rep. of S. Comm. On Homeland Sec. & Governmental Affairs & S.
Comm. on Rules & Admin., 117th Cong., *Examining the U.S. Capitol Attack:
A Review of the Security, Planning, and Response Failures on January 6,* (June
8, 2021) ........................................................ 33

**Regulations**

\* 36 C.F.R. § 1270.44 ........................................................ 5

**U.S. Constitution**

* U.S. Const., art. I, § 3 ........................................................................ 27

_____

* Authorities upon which President Trump chiefly relies are marked with an asterisk.

# GLOSSARY

| | |
|---|---|
| Archivist | The Archivist of the United States |
| Committee | United States House Select Committee to Investigate the January 6th Attack on the United States Capitol |
| H. Res. 503 | House Resolution 503 |
| NARA | National Archives and Records Administration |
| PRA | Presidential Records Act |

## INTRODUCTION AND SUMMARY OF ARGUMENT

Our Constitution and laws limit government power through reasonable mechanisms, including the separation of powers and the steady and fair application of legal precedent over time to ensure that individual rights and ordered liberty are preserved. But the lower court and Appellees would have this Court eviscerate such reasonable constraints by effectively abolishing binding precedent and any limits on congressional power in the name of political expediency.

This Court should refuse the invitation to grant Congress and the incumbent President unfettered power to collude and undermine the sanctity of our Republic. Instead, the Court should hold that statutory construction, binding precedent, and our Constitution confirm that the Committee's request at issue here is unlawful and unconstitutional. Moreover, President Trump's assertion of executive privilege is valid.

Appellees suggest that the district court's decision on the preliminary injunction is due deference and should be reviewed for clear error. The

opinion below, however, is almost entirely based on mistakes of law concerning statutory and constitutional construction, rather than factual determinations or balancing tests. Consequently, this Court's review of those decisions is de novo.

Highly partisan and hotly contested allegations regarding the Committee and Appellees opinions regarding the cause of the January 6, 2021, unrest at the Capitol saturate their briefs, provide the alleged basis for Appellees' attempt to invade President Trump's rights and privileges regarding confidential presidential communications. Appellees' attempt to convince this Court to adopt their partisan narrative as a predicate to undoing important constitutional and statutory safeguards, should be flatly rejected by the Court.

President Trump is likely to succeed in showing that the Committee's record request is unlawful as it violates the Presidential Records Act and its implementing regulations, the constitutional safeguards regarding separation of powers, and the protections of executive privilege. Moreover,

the specific analysis of whether each record is properly producible must be completed document-by-document, and not by the scattergun approach advocated by Appellees and the district court. The decision of the district court should be reversed and a preliminary injunction or a document-by-document analysis should be ordered.

## ARGUMENT

### I.    The Decision of the District Court is Reviewed De Novo

Appellees wrongly assert that the Court should review the district court's decision for an abuse of discretion, and only vaguely acknowledge that the lower court's erroneous conclusions of law are reviewed de novo. Committee Br., at 30; Gov. Br., at 22-23. Instead, the district court's decision only contains legal conclusions, which are owed no deference on appeal. *Guedes v. ATF*, 920 F.3d 1, 10 (D.C. Cir. 2019).

In considering this appeal, the Court must first review whether President Trump is likely to succeed in showing that the Committee's request runs afoul of any of the following: (a) the constitutional separation-

of-powers, (b) executive privilege, or (c) the Presidential Records Act and its implementing regulations. There is no factual dispute regarding the content of the Committee's request or the manner of how the request was considered by the Biden Administration. Moreover, Appellees do not contest that the records in question are confidential communications and thus subject to the protections of the Presidential Records Act and executive privilege. The dispute concerns legal rights of Presidents regarding records created during their tenure and the obligations of incumbent Presidents and the other branches of government to respect those rights.

Likewise, the dispute regarding the equitable injunctive factors is also reviewed de novo because they involve those same questions of law. Production of the records at issue would irreparably harm Appellant because it would destroy his firmly rooted regulatory, statutory, and constitutional rights. *See Trump v. Mazars USA, LLP*, 140 S. Ct. 2019 (2020); *see also* 44 U.S.C. § 2205; 36 C.F.R. § 1270.44. The equities and public interest are also both served by the enforcement of the Constitution and law of the

United States. *Connection Dist. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.") (citation omitted).

Put simply, the district court's decision was not based upon a factually sensitive balancing test of the relevant factors. Rather it was based on flawed legal analysis. Consequently, the review is de novo. Even so, the conclusions of the district court are so infirm as to also fail even a clear error or abuse of discretion analysis.

## II. The Basis Underlying Appellees Attempted Invasion of Executive Privilege and Confidentiality is Premised on False Partisan Allegations and Media Bluster Regarding January 6th

The Appellees devote an extended portion of their brief to recounting their version, not only of the unrest that took place on January 6th, but of the heated 2020 election as a whole. Their view of the facts is deeply partisan and hotly debated. Appellees also attempt to cover old ground and issues that have already been decided in President Trump's favor. The Democratic-controlled Congress attempted to impeach President Trump for

"incitement" of the January 6th unrest, and President Trump was acquitted. President Trump objects to the facts as presented. More importantly, it would be inappropriate for the Court to deny President Trump his firmly rooted statutory and constitutional rights and obligations to maintain the confidentiality of presidential records based only upon contested allegations and insinuations of the Committee and the Archivist.

To be blunt: a current president cannot destroy the confidentiality of Executive Branch communications and the important reliance interests attached to that confidentiality for his own political advantage to the detriment of his predecessors and successors. The structural organization that is the separation of powers does not change based upon the shifting political ties of the White House's occupant and the current Congress. Here, the incumbent President's personal political interests are aligned with the congressional majority, and his political objective will do grave damage to the integrity of our Republic's constitutional structure if it is achieved. The political animus shown by President Biden and his allies in Congress weighs

against the unfettered deference towards the incumbent President sought by Appellees.

There is little doubt President Biden is doing the bidding of a Congress controlled by his party. Appellees' briefs are rife with political hostility. The Committee is not tasked with a criminal or impeachment investigation of President Trump, nor is it tasked with determining the status or integrity of the 2020 election. Congress and the President are on a fishing expedition to find damaging information on their former and future political opponents. The Appellees themselves note that some of the documents requested are "documents and communications of the President and certain of his advisors relating to the transfer of power and obligation to follow the rule of law." Gov. Br., 11. The Appellees' clear disdain for President Trump is leading them to a course of action that will result in permanent damage to the institution of the presidency.

Appellees argue that President Biden's decision not to defend the President's assertion of executive privilege is appropriate because he

recognized that "the conduct under investigation extends far beyond typical deliberations concerning the proper discharge of the President's constitutional responsibilities." Committee Br. 45. Therefore, "any risk that disclosing those communications would impermissibly chill legitimate Presidential decision making is negligible." *Id.* In reality, their success would gut the protections afforded presidential communications of any just and uniform standard. An incumbent president would always be able to condemn the actions of a former president from a rival party and permit confidentiality to be broken to further political ends. Appellees cannot hide from the clear consequences of their proposed outcome—the Executive Branch's ability to have frank, open, and honest internal discussions and debates about serious and consequential matters, often with a limited amount of time prior to final presidential decisions, will be severely and permanently damaged.

**III. President Trump is Likely to Succeed in Showing that the Presidential Records at Issue are Protected from Production by Statute and the Constitution**

**a. The Presidential Records Act dispositively resolves this dispute**

Appellees largely fail to conduct a statutory analysis of the Presidential Records Act in their respective briefs. The Committee and NARA's failure to comprehend the Presidential Records Act and its implementing regulations' statutory framework and adhere to their prerequisites for producing restricted Presidential records is dispositive, obviating any need for the Court to reach the constitutional questions raised by the case. Understandably, Appellants largely ignore President Trump's sound analysis of that statute.

Appellees want the Court to recognize broad authority of the Archivist to adjudicate disputes regarding a former president's claims of rights and privileges pursuant to the Presidential Records Act. They are powers that he simply does not have. Indeed, even if this Court were to find that the incumbent President does have the ability to overrule his predecessor when

it comes to his privileged communications, the language of the statute is clear that the incumbent's only authority is to uphold or not uphold a former President's assertion.[1] That decision to uphold or not uphold a claim of privilege is a decision on the legal correctness of the original assertion of said privilege, and specifically not an invitation for anyone to waive an otherwise valid privilege. *See Machin v. Zuckert*, 316 F.2d 336 (D.C. Cir. 1963) (affirming in part a decision that the Secretary of the Air Force's claim of privilege against production of reports concerning aircraft accident in which the appellant was badly injured would be upheld except with respect to factual findings of Air Force mechanics as to which it would not be upheld unless the Air Force would show why even that portion of the report should be immune from subpoena).  Had Congress intended to give the incumbent President the ability to waive a claim of a former President, they certainly

---

[1] For example, *See Carter v. United States*, 684 A.2d 331, 334 (D.C. 1996), in which the Court discusses the factors involved in "upholding" a claim of privilege, i.e. in deciding whether the privilege did or did not exist in a given instance, as opposed to whether or not an existing privilege  should be waived or overcome

had the vocabulary to do so. *See, e.g.*, 44 U.S.C. § 2204 (b)(1)(A)(i) (allowing a *former* President to "waive" a privilege).

The Archivist's discretion regarding the classification of records is limited. The Archivist has no special knowledge or expertise about which documents in its possession should or should not be privileged, and it would be wholly inappropriate for him to weigh in, as he has done in this case, about a topic that does not concern his area of expertise. The PRA merely permits the Archivist to make an initial determination and recommendation as to whether or not the former President's claim of privilege was correct in the first instance, i.e., whether or not these types of records are the type of records about which a claim of Executive Privilege could be applied, and not whether or not—for political reasons—an otherwise valid claim should be waived. That, of course, is an area where the Archivist, the custodian of U.S. Presidential records, may have something worthwhile to say.

Under Section 2205, the Archivist may only disclose restricted-access Presidential records to Congress if the Archivist determines the information in the requested records is needed for the conduct of specific congressional

business and the information is not otherwise available, and the former President objecting to disclosure has his rights and privileges judicially reviewed. The Archivist has not made any of the necessary determinations for the specific congressionally requested Presidential records, especially any determination that the requested documents contain information that is not otherwise available. Moreover, the statute does not say the Archivist can disclose requested-but-objected-to-restricted-access documents to Congress simply because Congress asks, or simply because Congress can obtain the information most conveniently and expeditiously from the Archivist. To the contrary, the statute allows the Archivist to only disclose the records to Congress when the information in those records is "not otherwise available." Under the statute then, Congress must demonstrate to the Archivist's, and ultimately this Court's, satisfaction it has tried but failed to obtain the information through all other available means.

The Appellees have failed to show that the documents they seek are unavailable in any manner except through records requests to the Archivist. For instance, in their broad swath of requests, they seek communications

with third parties, who were not Executive Branch officials or employees. The Committee is clearly obligated by the PRA to attempt to receive communications directly from those third parties prior to propounding a PRA records request.

Under the PRA, the incumbent President has no power to waive a right or privilege of his predecessor. The sole question is whether a record is properly designated. Here, there is no dispute that President Trump properly designated confidential communications as being restricted from disclosure under the PRA. The requests of the Committee and the attempted waiver by President Biden and the Archivist are both ineffective. Consequently, President Trump is entitled to relief on this ground alone, and the Court need not consider the constitutional issues.

**b. The records at issue must be reviewed individually**

Appellees continue to use and advocate for a scattergun approach in attempting to resolve the serious statutory and constitutional issues underlying the production of a former President's records over his objection.

The district court held the decision by the incumbent was dispositive, simply because the incumbent currently holds the office, and declined to conduct a document-by-document analysis *in camera*. JA 196-97. This was error. Appellees support that decision and insist their proffered—and incorrect—narrative regarding the January 6th unrest at the Capitol broadly justifies the waiver of privilege without a specific review of the records at issue and the constitutionally protected interests at stake. They too are wrong.

A document-by-document analysis is required and especially important because each request and record must undergo a regulatory, statutory, and constitutional analysis prior to production. Further, there is no dispute the records at issue are communications regarding executive deliberations and subject to both the PRA and executive privilege. A proper analysis of these records requires the Archivist to submit the documents at issue to the district court for a confidential, *in camera* review. Only then can a dispute between a former and incumbent President concerning whether

the records are subject to disclosure be made under the various, contested legal authorities without prematurely destroying confidentiality.

A proposal for a document-by-document review is far from novel; courts regularly review documents in camera to resolve privilege disputes. *See Armstrong v. Exec. Office of the President*, 97 F.3d 575, 580 (D.C. Cir. 1996) (noting the use of *in camera* review is generally encouraged); *Ray v. Turner*, 587 F.2d 1187 (D.C. Cir. 1978) (remanding a case when a district court declined to exercise its discretion to conduct an *in camera* review of documents); *Protect Democracy Project, Inc. v. U.S. Nat'l Sec. Agency*, 443 F. Supp. 3d 1, 6 (D.D.C. 2020) (*in camera* review of classified documents to determine production was appropriate pursuant to Freedom of Information Act Request). Indeed, an *in camera* review of documents was specifically authorized in *United States v. Nixon*, 418 U.S. 683 (1974). Such a review will provide the Court an opportunity to consider specific records without openly discussing the interests and objections in a public forum, which would in and of itself substantially compromise, if not completely destroy, the confidences underlying the privilege.

An *in camera* analysis is also consistent with the judicial review rights afforded to former Presidents in a particular and meaningful way. This review would target the specifics of each record, through the lens of the relevant requests and significant statutory, separation of powers, and constitutional privilege concerns at issue. Most importantly, this review rejects the approach favored by the district court and Appellees, which would authorize disclosure based simply on the broad strokes of the Committee's politically loaded—and highly contested—factual allegations.

This case involves the reliability of confidential executive communications remaining confidential. Its importance cannot be overstated. This Court's decision will have a substantial impact on the ability of all future Presidents to receive full, frank, and confidential advice. It is vital the Court's analysis be specific and any invasion of the right to confidentiality be precise and limited. The analysis cannot be done in a vacuum, without regard to the specific concerns inherent with each specific record.

### c. Serious separation of powers concerns regarding Congress's access to presidential records survive a President's term of office and prohibit the production sought by Congress

##### 1. *The Committee Failed to Articulate a Legitimate Legislative Purpose for it Request*

While the Committee wanders off on tangential screeds about election integrity and incitement—issues not relevant to this case or issues that have previously been settled—it again fails to provide a valid legislative purpose that articulates in enough detail how the requested documents are "related to, and in furtherance of, a legitimate task of the Congress." *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031 (2020).

This is particularly important here, because when Congress seeks to access documents covered by executive privilege on the excuse that it intends to legislate, Congress's burden to show the documents "concern[ ] a subject on which legislation 'could be had,'" is weighty. *Id.* It must show the documents are "'demonstrably critical' to its legislative purpose." *Id.* at 2032. President Trump's status as a former president does not lighten Congress's heavy burden, because the documents are the type of confidential communications and records that are covered by the privilege, and this is

the exact scenario where disclosure will chill frank discussion in future administrations and for future presidents.

In contrasting President Trump's private papers with "sensitive Executive Branch deliberations," the *Mazars* court made clear the documents at issue in this case—"confidential deliberations within the Executive Branch"—are "fundamental to the operation of Government," and therefore "the privilege safeguards the public interest in candid, confidential deliberations within the Executive Branch." *Id.* In its brief, the Committee again failed to articulate an appropriate legislative purpose, let alone justification that meets the heightened standard required to intrude into the Executive Branch's confidential documents.

Unlike when Congress crafts legislation to fix perceived flaws in the Department of Justice or other congressionally created institutions of the Executive Branch, the President himself is unique, and his discretion to shepherd the Executive Branch should not be badgered by congressional overreach. Indeed, it is hard to imagine—given the vague examples

proffered by the Appellees and the focus of their fact section—what legislation could possibly be crafted in furtherance of the vast requests at issue here. Neither H. Res. 503 nor any other act of Congress suggested that the Committee should consider repealing the First Amendment or radically alter Article II of the Constitution. Presidents are free to use their bully pulpit, campaign for president, and challenge election results. Presidents are also vested with all the executive authority of the United States, which by the design of our founders necessarily includes broad discretion. JA 189.

The Committee's brief purports to provide multiple examples of areas where potential legislation could be had. Committee Br. at 34-35. The hypothetical examples and reasoning, however, fail to explain the Committee's need for the specific information sought in relation to the legislative purposes claimed. Members of the Committee have already concluded that the former President is guilty, no matter what the evidence says. They can legislate accordingly, or they must explain why each item requested would be material to any decision they intend to make.

The Committee admits it is their belief that the "Select Committee needs the requested information to reconstruct the extraordinary events of that day." Committee Br. at 46. The D.C. Circuit rejected such an approach when it explained that Congress's legislative tasks differ from that of a grand jury, or other investigative bodies. Instead, "[w]hile fact-finding by a legislative committee is undeniably a part of its task, legislative judgments normally depend more on the predicted consequences of proposed legislative actions and their political acceptability, than on precise reconstruction of past events." *Senate Select Comm. on Presidential Campaign Activities*, 498 F.2d 725, 732 (D.C. Cir. 1974).

Of course, Congressional "interest in past illegality can be wholly consistent with an intent to enact remedial legislation." *Trump v. Mazars, USA, LLP*, 940 F.3d 710, 728 (D.C. Cir. 2019) (emphasis added). But this is not the case here. Calling it "absurd" to say that any legislative decisions could be made without access to clearly privileged materials does not make it so;

Congress has yet to identify a single decision that would turn on any document or communications they have requested.

Appellees have failed, yet again, to suggest any meaningful limiting principle to Congress's authority to obtain presidential records. Instead, they effectively suggest that Congress has plenary power to request any information, from any party, at any time. They claim that the Committee's request here has a valid legislative purpose simply because the subject of the request was one on which legislation "could be had" or "may be had." Committee Br. 34; Gov. Br. 48. The Supreme Court soundly rejected this argument barely a year ago. *Mazars*, 140 S. Ct. at 2034 (rejecting Congress's approach because it aggravated separation of powers principles by eschewing any limits on the power to subpoena Presidential records).

Instead, the test for congressional requests is more demanding. A congressional request "is valid only if it is related to, and in furtherance of, a legitimate task of the Congress." *Mazars*, 140 S. Ct. at 2031 (cleaned up). Congress has no "general power to inquire into private affairs and compel

disclosures," and "there is no congressional power to expose for the sake of exposure." *Id.* (cleaned up). Because "legislation concerning the Presidency raises sensitive constitutional issues," Congress must "adequately identif[y] its aims and explain[] why the President's information will advance its consideration of the possible legislation." *Id.* at 2035. The Committee's failure to do so here is fatal to its request.

The Committee claims that its request serves a "clear legislative purpose: to understand the facts and causes surrounding the January 6 attack in order to develop legislation and other measures that will protect our Nation from a future assault." Committee Br. at 2. The NARA Defendants claim a similar legislative purpose. *See* Gov. Br. 58-59. But Appellees have completely failed to explain how the specific information sought will inform a specific, much less valid, legislative purpose. Mere conjecture is not enough to sustain the Committee's request.

Further, if Defendants are correct that the Committee has plenary authority to request the President's records to investigate any issue it

pleases, then it has the same limitless power to request the records of other Executive Branch officials, members of Congress, and the federal judiciary. Defendants are wrong. Congress has no freestanding oversight or investigative power; those powers are "justified solely as an adjunct to the legislative process," and they may not be deployed to pursue measures that exceed Article I's limitations. *Watkins v. United States*, 354 U.S. 178, 197, 187 (1957). Further, the Committee is not immune from having its purposes challenged; courts can and should assess its stated, contemporaneous purposes to determine whether they are legitimate or unlawful. *Shelton v. United States*, 404 F.2d 1292, 1297 (D.C. Cir. 1968). President Trump can challenge the request's pertinency and overbreadth; under governing law, requests must always be "reasonably relevant" to a legitimate legislative purpose. *McPhaul v. United States*, 364 U.S. 372, 381-82 (1960) (cleaned up).

In addition, the Committee's failed, nearly non-existent attempt to minimize the burden on President Trump specifically and the institution of the Presidency generally under the fourth *Mazars* factor should be rejected.

Committee Br. at 39-40. The number of records at issue here is enormous. Further, the limited time-period to review potentially responsive documents adds to the burden of the request. These burdens affect both President Trump as well as future presidents who may face similar requests if this request is authorized by the courts. The Committee's attempt to downplay the future chilling effect its request will have on every President and his aides is similarly unhelpful. Regardless of President Biden's determination, permitting the expansive request here would harm future presidents and their close aides by allowing invasive congressional fishing expeditions that will certainly chill candid advice and harm the institution of the presidency. *Nixon*, 418 U.S. at 705 ("[T]hose who expect public dissemination of their remarks may well temper candor with a concern for appearances and their own interests to the detriment of the decisionmaking process.").

2. *The Committee's True Purpose Undermines The Legality of The Request*

The two chief checks on a president's discretion are, first, his accountability at the ballot box—which President Trump could still face,

should he choose to pursue the White House in 2024—and, second, the formal mechanism by which the Constitution gives Congress power to hold a president to account for alleged and serious misdeeds: impeachment. *See Mazars*, 140 S. Ct. at 2045 (Thomas, J., dissenting). Congress may not, however, rifle through the confidential presidential papers of a former President to meet political objectives or advance a case study. Committee Br., at 38.

Rather than spell out the "demonstrably critical" need for these documents and sketch in some detail the likely legislation resulting from the Committee's quixotic endeavor, Appellees present a standard for judging congressional requests untethered by anything other than their own political judgments. The Committee's standard for judging congressional requests likewise provides no limiting principle for congressional power. Just this week, Congressman Adam Schiff, a member of the Committee, revealed on national television the true purpose of the Committee:

I think all we can do is expose all the malefactors, follow the evidence, wherever it leads, tell the American people the story of what went into January 6th, all the planning that went into it, who was behind it in terms of the money. What Donald Trump was doing, what was he not doing, at the time that the Capitol was being attacked, and make the case publicly, expose all the wrongdoing and at the same time make sure that we don't lose sight of our legislative agenda.

Late Night with Seth Meyers, *Rep. Adam Schiff Says It Was Torture Listening to Kevin McCarthy's Speech*, YouTube (Nov. 22, 2021), https://www.youtube.com/watch?v=mPvKNFC615o. As if he was not clear enough about the true purpose of the Committee, however, he continued by explaining that "[w]e have to hope that there are still enough American people with an open mind that they will follow the hearings that we are going to have in public…" *Id.*

Congressman Schiff *said the quiet part out loud*. He showed that the true objective of the Committee is not to legislate or to take any other legitimate legislative action. The purpose is exposure for exposure's sake and to score political points. The Supreme Court was clear, such objectives fail constitutional scrutiny. *Mazars*, 140 S. Ct. at 2032.

The Appellees' true goal is obviously to relitigate the impeachment they lost in the Senate. Like Ahab pursuing his white whale, Congressman Schiff and his colleagues' obsession with investigating and attacking President Trump is endless. But as Congress has no power of attainder, U.S. Const., Art. I, § 3, or inquest their pursuit is also improper.

3. *Appellee's have it backwards, they are required to first try and obtain this information elsewhere.*

The Committee claims that it could not obtain the requested information elsewhere, *see* Committee Br. at 52-53, but the Committee has mountains of evidence regarding the events of January 6th that are perfectly adequate to inform any proposed legislation. Additional, privileged records are not needed for the Committee to legislate. The Committee has never explained why other sources of information—outside of the requested records—could not "reasonably provide Congress the information it needs in light of its particular legislative objective." *Mazars*, 140 S. Ct. at 2035-36.

The Committee has failed to articulate a specific need for the specific records requested. The Committee seeks to highlight its need for the requested records because President Trump is a "case of one," Committee Br. at 38, but the Committee cannot ignore the Supreme Court's admonition that the President's unique constitutional position means that Congress may not look to him as a case study for general legislation. *Mazars*, 140 S. Ct. at 2035. The post-hoc legislative purposes proffered by the Committee are simply pretextual and cannot sustain the Committee's broad request.

### d. Appellees' attempt to undermine executive privilege is constitutionally infirm

Appellees disregard the standards set by the Supreme Court in *Nixon v. GSA*. 433 U.S. 425, 449 (1977). While they correctly assert that the former President has a right to be heard (Committee Br., 31; Gov. Br., 45) and that the executive privilege survives the President's term in office (Committee Br., 42; Gov. Br., 36), they are incorrect when they repeatedly claim that the incumbent President has greater weight or can simply overrule the former

President on the assertion of privilege. Committee Br. 26, 42; Gov. Br., 2, 15, 61. This argument would give unlimited power to the incumbent President and would abolish binding Supreme Court precedent.

Binding precedent confirms that President Trump may be "heard to assert" claims of the presidential communications privilege, "may legitimately assert the Presidential privilege," and that executive privilege survives the conclusion of a President's term of office. *GSA*, 433 U.S. at 439. These holdings cannot be disputed and should be upheld to protect our Constitution and the separation of powers. The lower court's argument, endorsed by Appellants, that these statements can simply be swept under the rug given President Biden's unilateral waiver of executive privilege here, is legally wrong and dangerous. The Supreme Court had good reason then, and this Court has good reason now, to give great weight to an assertion of executive privilege by a President, including the need for candid communications among close presidential advisers.

The Government acknowledges that situations could exist, "under unusual circumstances" where executive privilege is upheld over the objection of the incumbent President. Gov. Br., 28. It fails, however, to suggest any meaningful rubric for considering when a former President's claim of privilege would control over an incumbent's rejection of the claim. Instead, it wants the Court to fall into the trap of adopting its flawed conclusion that the events of January 6th justify the intrusion, absent any supporting evidence. Indeed, Appellees beg the question: Why would there be such an urgent necessity to investigate January 6th if Appellees were already so sure of its causes?

The *GSA* Court was clear—an incumbent's decision not to uphold a predecessor's claim of executive privilege only "*detracts*" from the assertion. *GSA,* 433 U.S. at 449 (emphasis added). This wording is significant. If the Court intended to create a right in the former President subject entirely to the determination of the incumbent, the Court would not have chosen a phrasing indicating that the lack of support merely reduces the strength of

the assertion. Instead, as supported by the language of the PRA discussed above, the Court clearly intended the lack of support from the incumbent to be only a single factor in the analysis; it is not determinative. *Id.*

If the incumbent's decision simply outweighs the former President's assertion, there would be no meaningful executive privilege. Appellees' test would turn executive privilege into a political weapon to be used against political enemies.

Under Appellees' test, executive privilege certainly would not be a privilege that was expected to survive the individual term of a President, especially in a partisan climate. Every time the White House changed political parties, all documents of any former President could be released if Congress simply requested them.

Appellees' test would shatter any illusion of protection for the executive staff who need to give their full and frank advice to the President. The advice given to advisers will be chilled and the result is that White House officials will spend their time covering their own necks rather than

giving full, frank advice to the President. The result of this rule in the future is obvious: it would have a very chilling effect. The Committee alleges that the chilling effect is best analyzed by the incumbent, but this is not so if the incumbent is blinded by political animus or has an inherent conflict of interest.

Nor do they mention that there is no evidence of any criminal act by anyone associated with the White House. The Appellees own briefs cite to reports that clearly show that the White House and President Trump took actions to ensure that the Capitol Police and executive agencies tasked with keeping the public and Congress safe on January 6, 2021, were preparing adequately for any eventuality. *Compare* Gov. Br., at 7-8 (citing Staff Rep. of S. Comm. On Homeland Sec. & Governmental Affairs & S. Comm. on Rules & Admin., 117th Cong., *Examining the U.S. Capitol Attack: A Review of the Security, Planning, and Response Failures on January 6,* (June 8, 2021)) ("HSGA Report"), *with* HSGA Report, at 77 ("At the end of the meeting, President Trump brought up the Joint Session, asking Mr. Miller whether they were

prepared.).” The FBI has also found scant evidence of *any* coordination of

the events on January 6th.[2]

Finally, and perhaps most importantly, the Supreme Court has only

allowed review of specific records for privilege determinations when

records would remain confidential, such as review by the Archivist or by the

court *in camera*. *Nixon*, 418 U.S. at 715-16; *GSA*, 433 U.S. at 451-52. This is the

only type of review that can be specific to each record, while also

maintaining the confidentiality of the record during the review process. At

minimum, such a document-by-document review is required here.

### e. The requested records are privileged

Executive privilege undoubtedly attaches to President Trump's

records in question. In an attempt to discredit this privilege, Appellees

blatantly mischaracterize President Trump's actions. Appellees argue the

---

[2] Mark Hosenball and Sarah N. Lynch, *Exclusive: FBI finds scant evidence U.S. Capitol attack was coordinated –sources*, REUTERS, Aug. 20, 2021, https://www.reuters.com/world/us/exclusive-fbi-finds-scant-evidence-us-capitol-attack-was-coordinated-sources-2021-08-20/.

privilege should be denied because the documents may shed light on government misconduct. Committee Br., 45; Gov.Br., 26. Further, they argue that executive privilege should not be used to shield information reflecting an effort to subvert the Constitution. Committee Br., 47; Gov. Br., 32. The documents Appellees seek, however, reflect no misconduct or subversion of the Constitution, but rather President Trump's commitment to upholding his constitutional duty. Thus, executive privilege applies; President Trump was acting well within the bounds of the functions of the executive.

Characterizing President Trump's actions as "misconduct" or an effort to "subvert the Constitution" is perverse. President Trump's communications, which the Committee requests, involve quintessential duties of the executive. As such, there is a strong argument to protect these communications through executive privilege.

Finally, the Appellees' argue that President Biden's waiver is somehow justified because Presidents have previously made accommodations with Congress regarding the assertion or waiver of

executive privilege. Gov. Br., 36. This argument is logically unsound. While it may be appropriate to negotiate partial accommodations from time to time, it hardly provides a precedent for an involuntary invasion of the privilege.

## CONCLUSION

For the foregoing reasons, the decision of the district court should be reversed, and this matter should be remanded an the Court should Order that a preliminary injunction be granted or, in the alternative, that the district court conduct a document-by-document review of the records at issue.

Dated: November 24, 2021                Respectfully submitted,

<u>/s/ Jesse R. Binnall</u>
Jesse R. Binnall (VA022)
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, VA 22314
Tel: (703) 888-1943
Fax: (703) 888-1930
jesse@binnall.com

Justin R. Clark
ELECTIONS, LLC
1050 Connecticut Avenue, NE,
Suite 500

Washington, D.C. 20036
(202) 987-9944
justin.clark@electionlawllc.com

*Counsel for Donald J. Trump*

CERTIFICATE OF COMPLIANCE

Undersigned counsel certifies that this Reply Brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because, excluding the parts of the Reply Brief exempted by Federal Rule of Appellate Procedure 32(f) and D.C. Circuit Rule 32(e)(1), it contains 5,907 words.

Undersigned counsel certifies that this Reply Brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this Reply Brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Palatino Linotype.

Dated: November 24, 2021                    Respectfully submitted,

/s/ Jesse R. Binnall
Jesse R. Binnall (VA022)
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, VA 22314
Tel: (703) 888-1943
Fax: (703) 888-1930
jesse@binnall.com

## CERTIFICATE OF SERVICE

I certify that a copy of the foregoing was filed with the Clerk of the Court using the Court's CM/ECF system, which will send a copy to all counsel of record.

Dated: November 24, 2021                    Respectfully submitted,

/s/ Jesse R. Binnall
Jesse R. Binnall (VA022)
BINNALL LAW GROUP, PLLC
717 King Street, Suite 200
Alexandria, VA 22314
Tel: (703) 888-1943
Fax: (703) 888-1930
jesse@binnall.com

*Counsel for Donald J. Trump*