# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 30, 2021       Decided December 9, 2021

No. 21-5254

DONALD J. TRUMP, IN HIS CAPACITY AS THE 45TH PRESIDENT
OF THE UNITED STATES,
APPELLANT

v.

BENNIE G. THOMPSON, IN HIS OFFICIAL CAPACITY AS
CHAIRMAN OF THE UNITED STATES HOUSE SELECT
COMMITTEE TO INVESTIGATE THE JANUARY 6TH ATTACK ON
THE UNITED STATES CAPITOL, ET AL.,
APPELLEES

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:21-cv-02769)

———

*Jesse R. Binnall* and *Justin R. Clark* argued the cause
and filed the briefs for appellant.

*Douglas N. Letter*, General Counsel, U.S. House of
Representatives, argued the cause for appellees Bennie
Thompson and the United States House Select Committee to
Investigate the January 6th Attack on the United States Capitol.
With him on the brief were *Todd B. Tatelman*, Principal Deputy
General Counsel, *Stacie M. Fahsel*, Associate General

2

Counsel, *Eric R. Columbus*, Special Litigation Counsel, and *Annie L. Owens*, *Mary B. McCord*, and *Joseph W. Mead*, Institute for Constitutional Advocacy and Protection, Georgetown University Law Center.

*Brian M. Boynton*, Acting Assistant Attorney General, U.S. Department of Justice, argued the cause for appellee National Archives and Records Administration. With him on the brief were *Michael S. Raab* and *Gerard Sinzdak*, Attorneys. *Mark R. Freeman*, *Sarah E. Harrington*, and *Elizabeth J. Shapiro*, Attorneys, entered appearances.

*Elizabeth B. Wydra* and *Brianne J. Gorod* were on the brief for *amici curiae* Former Department of Justice Officials in support of appellees.

*Norman L. Eisen* was on the brief for *amici curiae* States United Democracy Center and Former Federal, State, and Local Officials in support of appellees.

*Nikhel S. Sus* and *Conor M. Shaw* were on the brief for *amici curiae* Citizens for Responsibility and Ethics in Washington and Former White House Attorneys in support of appellees.

*John A. Freedman*, *Samuel F. Callahan*, and *Cameron Kistler* were on the brief for *amici curiae* Former Members of Congress in support of appellees.

*Kelly B. McClanahan* was on the brief for *amici curiae* Government Accountability Project, et al. in support of appellees.

Before: MILLETT, WILKINS, and JACKSON, *Circuit Judges*.

3

Opinion for the Court filed by *Circuit Judge* MILLETT.

MILLETT, *Circuit Judge*:  On January 6, 2021, a mob professing support for then-President Trump violently attacked the United States Capitol in an effort to prevent a Joint Session of Congress from certifying the electoral college votes designating Joseph R. Biden the 46th President of the United States.  The rampage left multiple people dead, injured more than 140 people, and inflicted millions of dollars in damage to the Capitol.[1]   Then-Vice President Pence, Senators, and Representatives were all forced to halt their constitutional duties and flee the House and Senate chambers for safety.

The House of Representatives subsequently established the Select Committee to Investigate the January 6th Attack on the United States Capitol, and charged it with investigating and reporting on the "facts, circumstances, and causes relating to" the January 6th attack on the Capitol, and its "interference with the peaceful transfer of power[.]"  H.R. Res. 503, 117th Cong. § 3(1) (2021).  The House Resolution also tasked the January 6th Committee with, among other things, making "legislative recommendations" and proposing "changes in law, policy, procedures, rules, or regulations" both to prevent future acts of

---

[1] STAFF REP. OF S. COMM. ON HOMELAND SECURITY & GOVERNMENTAL AFFS. & S. COMM. ON RULES & ADMIN., 117TH CONG., EXAMINING THE U.S. CAPITOL ATTACK:  A REVIEW OF THE SECURITY, PLANNING, AND RESPONSE FAILURES ON JANUARY 6, at 29 (June 8, 2021) ("*Capitol Attack* Senate Report"); *Hearing on Health and Wellness of Employees and State of Damages and Preservation as a Result of January 6, 2021 Before the Subcomm. on the Legis. Branch of the H. Comm. on Appropriations* ("House Hearing"), 117th Cong., at 1:25:40–1:26:36 (Feb. 24, 2021) (statement of J. Brett Blanton, Architect of the Capitol), https://perma.cc/XS7N-MRG8.

4

such violence and to "improve the security posture of the United States Capitol Complex[.]" *Id.* § 4(b)(1), (c)(2).

As relevant here, the January 6th Committee sent a request to the Archivist of the United States under the Presidential Records Act, 44 U.S.C. § 2205(2)(C), seeking the expeditious disclosure of presidential records pertaining to the events of January 6th, the former President's claims of election fraud in the 2020 presidential election, and other related documents.

This preliminary injunction appeal involves only a subset of those requested documents over which former President Trump has claimed executive privilege, but for which President Biden has expressly determined that asserting a claim of executive privilege to withhold the documents from the January 6th Committee is not warranted. More specifically, applying regulations adopted by the Trump Administration, President Biden concluded that a claim of executive privilege as to the specific documents at issue here is "not in the best interests of the United States," given the "unique and extraordinary circumstances" giving rise to the Committee's request, and Congress's "compelling need" to investigate "an unprecedented effort to obstruct the peaceful transfer of power" and "the most serious attack on the operations of the Federal Government since the Civil War." Letter from Dana A. Remus, Counsel to the President, to David Ferriero, Archivist of the United States (Oct. 8, 2021), J.A. 107–108 ("First Remus Ltr."); *see also* Letter from Dana A. Remus, Counsel to the President, to David Ferriero, Archivist of the United States (Oct. 8, 2021), J.A. 113 ("Second Remus Ltr."); Letter from Dana A. Remus, Counsel to the President, to David Ferriero, Archivist of the United States (Oct. 25, 2021), J.A. 173–174 ("Third Remus Ltr.").

5

The central question in this case is whether, despite the exceptional and imperative circumstances underlying the Committee's request and President Biden's decision, a federal court can, at the former President's behest, override President Biden's decision not to invoke privilege and prevent his release to Congress of documents in his possession that he deems to be needed for a critical legislative inquiry.

On the record before us, former President Trump has provided no basis for this court to override President Biden's judgment and the agreement and accommodations worked out between the Political Branches over these documents. Both Branches agree that there is a unique legislative need for these documents and that they are directly relevant to the Committee's inquiry into an attack on the Legislative Branch and its constitutional role in the peaceful transfer of power.

More specifically, the former President has failed to establish a likelihood of success given (1) President Biden's carefully reasoned and cabined determination that a claim of executive privilege is not in the interests of the United States; (2) Congress's uniquely vital interest in studying the January 6th attack on itself to formulate remedial legislation and to safeguard its constitutional and legislative operations; (3) the demonstrated relevance of the documents at issue to the congressional inquiry; (4) the absence of any identified alternative source for the information; and (5) Mr. Trump's failure even to allege, let alone demonstrate, any particularized harm that would arise from disclosure, any distinct and superseding interest in confidentiality attached to these particular documents, lack of relevance, or any other reasoned justification for withholding the documents. Former President Trump likewise has failed to establish irreparable harm, and the

6

balance of interests and equities weigh decisively in favor of disclosure.[2]

For those reasons, we affirm the district court's judgment denying a preliminary injunction as to those documents in the Archivist's first three tranches over which President Biden has determined that a claim of executive privilege is not justified.

**I**

**A**

On November 3, 2020, Americans elected Joseph Biden as President, giving him 306 electoral college votes. Then-President Trump, though, refused to concede, claiming that the election was "rigged" and characterized by "tremendous voter fraud and irregularities[.]" President Donald J. Trump, *Statement on 2020 Election Results* at 0:34–0:46, 18:11–18:15, C-SPAN (Dec. 2, 2020), https://www.c-span.org/video/?506975-1/president-trump-statement-2020-election-results (last accessed Dec. 7, 2021). Over the next several weeks, President Trump and his allies filed a series of lawsuits challenging the results of the election. *Current Litigation*, ABA: STANDING COMM. ON ELECTION LAW (April 30, 2021), https://perma.cc/9CRN-2464. The courts rejected every one of the substantive claims of voter fraud that was raised. *See, e.g.*, *Donald J. Trump for President, Inc. v. Secretary of Pennsylvania*, 830 F. App'x 377, 381 (3d Cir. 2020) ("[C]alling an election unfair does not make it so. Charges

---

[2] Given former President Trump's failure to meet his burden, we need not decide to what extent a court could, after a sufficient showing of congressional need, second guess a sitting President's judgment that invoking privilege is not in the best interests of the United States.

7

require specific allegations and then proof.  We have neither here.").

As required by the Twelfth Amendment to the Constitution and the Electoral Count Act, 3 U.S.C. § 15, a Joint Session of Congress convened on January 6, 2021 to certify the results of the election.  167 CONG. REC. H75–H85 (daily ed. Jan. 6, 2021).  In anticipation of that event, President Trump had sent out a Tweet encouraging his followers to gather for a "[b]ig protest in D.C. on January 6th" and to "[b]e there, will be wild!"  Donald Trump (@realDonaldTrump), TWITTER (Dec. 19, 2020, 1:42 AM) ("Statistically impossible to have lost the 2020 Election.").

Shortly before noon on January 6th, President Trump took the stage at a rally of his supporters on the Ellipse, just south of the White House.  J.A. 180.  During his more than hour-long speech, President Trump reiterated his claims that the election was "rigged" and "stolen," and urged then-Vice President Pence, who would preside over the certification, to "do the right thing" by rejecting various States' electoral votes and refusing to certify the election in favor of Mr. Biden.  *See* Donald J. Trump, *Rally on Electoral College Vote Certification* at 3:33:05–3:33:10, 3:33:32–3:33:54, 3:37:19–3:37:29, C-SPAN (Jan. 6, 2021), https://www.c-span.org/video/?507744-1/rally-electoral-college-vote-certification (last accessed Dec. 7, 2021) ("January 6th Rally Speech").  Toward the end of the speech, President Trump announced to his supporters that "we're going to walk down Pennsylvania Avenue * * * to the Capitol and * * * we're going to try and give our Republicans * * * the kind of pride and boldness that they need to take back our country."  *Id.* at 4:42:00–4:42:32.  Urging the crowd to "demand that Congress do the right thing and only count the electors who have been lawfully slated[,]" he warned that "you'll never take back our country with weakness" and

8

declared "[w]e fight like hell and if you don't fight like hell, you're not going to have a country anymore." *Id.* at 3:47:20–3:47:42, 4:41:17–4:41:33.

Shortly after the speech, a large crowd of President Trump's supporters—including some armed with weapons and wearing full tactical gear—marched to the Capitol and violently broke into the building to try and prevent Congress's certification of the election results. *See Capitol Attack* Senate Report at 23, 27–29. The mob quickly overwhelmed law enforcement and scaled walls, smashed through barricades, and shattered windows to gain access to the interior of the Capitol. *Id.* at 24–25. Police officers were attacked with chemical agents, beaten with flag poles and frozen water bottles, and crushed between doors and throngs of rioters. *Id.* at 28–29; *Hearing on the Law Enforcement Experience on January 6th Before the H. Select Comm. to Investigate the January 6th Attack on the U.S. Capitol*, 117th Cong., at 2 (July 27, 2021) (statement of Sgt. Aquilino A. Gonell, U.S. Capitol Police).

As rioters poured into the building, members of the House and Senate, as well as Vice President Pence, were hurriedly evacuated from the House and Senate chambers. *Capitol Attack* Senate Report at 25–26. Soon after, rioters breached the Senate chamber. *Id.* In the House chamber, Capitol Police officers "barricaded the door with furniture and drew their weapons to hold off rioters." *Id.* at 26. Some members of the mob built a hangman's gallows on the lawn of the Capitol, amid calls from the crowd to hang Vice President Pence.[3]

---

[3] 167 Cong. Rec. E1133 (daily ed. Oct. 22, 2021) (statement of Rep. Sheila Jackson Lee); 167 Cong. Rec. H2347 (daily ed. May 14, 2021) (statement of Rep. Steve Cohen); Peter Baker & Sabrina Tavernise, *One Legacy of Impeachment:     The Most Complete*

9

Even with reinforcements from the D.C. National Guard, the D.C. Metropolitan Police Department, Virginia State Troopers, the Department of Homeland Security, and the FBI, Capitol Police were not able to regain control of the building and establish a security perimeter for hours. *Capitol Attack* Senate Report at 26. The Joint Session reconvened late that night. It was not until 3:42 a.m. on January 7th that Congress officially certified Joseph Biden as the winner of the 2020 presidential election. *Id.*

The events of January 6, 2021 marked the most significant assault on the Capitol since the War of 1812.[4] The building was desecrated, blood was shed, and several individuals lost their lives. *See Capitol Attack* Senate Report at 27–29. Approximately 140 law enforcement officers were injured, and one officer who had been attacked died the next day. *Id.* at 29. In the aftermath, workers labored to sweep up broken glass, wipe away blood, and clean feces off the walls.[5] Portions of the building's historic architecture were damaged or destroyed, including "precious artwork" and "[s]tatues, murals, historic benches and original shutters[.]" House Hearing at 1 (statement of J. Brett Blanton, Architect of the Capitol).

---

*Account So Far of Jan. 6*, N.Y. TIMES (Feb. 13, 2021), https://perma.cc/2Z47-5XHX.

[4] Jess Bravin, *U.S. Capitol Has a History of Occasional Violence, but Nothing Like This*, WALL ST. J. (Jan. 6, 2021), https://perma.cc/TPW2-9CD8; Press Release, Liz Cheney, Congresswoman, House of Representatives, A Select Committee Is The Only Remaining Option To Thoroughly Investigate January 6th (June 30, 2021), https://perma.cc/5RNC-Q6J3.

[5] Baker & Tavernise, note 3, *supra*.

10

**B**

On June 30, 2021, the United States House of Representatives created the Select Committee to Investigate the January 6th Attack on the United States Capitol. H.R. Res. 503. The House directed the Committee to (1) "investigate the facts, circumstances, and causes relating to the domestic terrorist attack on the Capitol, including * * * influencing factors that contributed to" it; (2) "identify, review, and evaluate the cause of and the lessons learned" from the attack, including "the structure, coordination, operational plans, policies, and procedures of the Federal Government, * * * particularly with respect to detecting, preventing, preparing for, and responding to targeted violence and domestic terrorism"; and (3) "issue a final report to the House containing such findings, conclusions, and recommendations for corrective measures * * * as it may deem necessary." *Id.* § 4(a). Those "corrective measures" include "changes in law, policy, procedures, rules, or regulations" to (1) "prevent future acts of violence * * * targeted at American democratic institutions"; (2) "improve the security posture of the United States Capitol Complex"; and (3) "strengthen the security and resilience" of the United States' "democratic institutions[.]" *Id.* § 4(c).

The resolution expressly incorporates Rule XI of the Rules of the House of Representatives, which empowers the Committee "to require, by subpoena or otherwise, the attendance and testimony of such witnesses and the production of books, records, correspondence, memoranda, papers, and documents as it considers necessary," including from "the President, and the Vice President, whether current or former, in a personal or official capacity, as well as the White House, the Office of the President, the Executive Office of the President, and any individual currently or formerly employed in the White House, Office of the President, or Executive

11

Office of the President[.]"  Rules of the U.S. House of Reps. (117th Cong.) XI.2(m)(1)(B) & (m)(3)(D) (2021); *see also* H.R. Res. § 5(c).

## C

On August 25, 2021, pursuant to the Presidential Records Act, 44 U.S.C. § 2205(2)(C), the January 6th Committee requested that the United States Archivist produce from the National Archives documents, communications, videos, photographs, and other media generated within the White House on January 6, 2021 that relate to the rally on the Ellipse, the march to the Capitol, the violence at the Capitol, and the activities of President Trump and other high-level Executive Branch officials that day.  Letter from Bennie G. Thompson, Chairman of the January 6th Committee, to David Ferriero, Archivist of the United States (Aug. 25, 2021), J.A. 33–44 ("Thompson Ltr.").  The Committee also asked for calendars and schedules documenting meetings or events attended by President Trump, White House visitor records, and call logs and telephone records from January 6th.  J.A. 34–36.  In addition, the Committee requested records from specified time frames in 2020 and 2021 relating to (1) efforts to contest the results of the 2020 presidential election, (2) the security of the Capitol, (3) the planning of protests, marches, rallies, or speeches in D.C. leading up to January 6th, (4) information former President Trump received regarding the results of the 2020 election and his public messaging about those results, and (5) the transfer of power from the Trump Administration to the Biden Administration.  J.A. 36–44.

"Given the urgent nature of [the] request," the Committee asked the Archivist to "expedite [its] consultation and processing times pursuant to * * * 36 C.F.R. § 1270.44(g)." Thompson Ltr., J.A. 33.

12

On August 30, 2021, as provided by regulation, the Archivist notified former President Trump that he had identified a first tranche of 136 pages of responsive records that he intended to disclose to the January 6th Committee.  J.A. 125; 36 C.F.R. § 1270.44(c).

President Biden was notified of that same planned disclosure about a week later.   J.A. 125; 36 C.F.R. § 1270.44(c).  The Archivist later withdrew seven pages from disclosure as non-responsive.  J.A. 125.  On October 8, 2021, the former President advised the Archivist that he was asserting executive privilege over 46 of those pages.  J.A. 110–111, 126.  The documents subject to Mr. Trump's assertion of privilege involve "daily presidential diaries, schedules, [visitor logs], activity logs, [and] call logs, * * * all specifically for or encompassing January 6, 2021[,]" "drafts of speeches, remarks, and correspondence concerning the events of January 6, 2021[,]" and "three handwritten notes concerning the events of January 6 from [former Chief of Staff Mark] Meadows' files[.]"  J.A. 129.  Former President Trump also made "a protective assertion of constitutionally based privilege with respect to all additional records" to be produced.  J.A. 111.

That same day, Counsel to President Biden informed the Archivist that the President had "determined that an assertion of executive privilege is not in the best interests of the United States, and therefore is not justified as to any of the Documents" in the first tranche.  First Remus Ltr., J.A. 107; 36 C.F.R. § 1270.44(d).  The letter explained:

> [T]he insurrection that took place on January 6, and the extraordinary events surrounding it, must be subject to a full accounting to ensure nothing similar ever happens again.  Congress has a compelling need in service of its legislative functions to understand the

13

circumstances that led to these horrific events. The
available evidence to date establishes a sufficient
factual predicate for the Select Committee's
investigation: an unprecedented effort to obstruct the
peaceful transfer of power, threatening not only the
safety of Congress and others present at the Capitol,
but also the principles of democracy enshrined in our
history and our Constitution. The Documents shed
light on events within the White House on and about
January 6 and bear on the Select Committee's need to
understand the facts underlying the most serious
attack on the operations of the Federal Government
since the Civil War.

These are unique and extraordinary circumstances.
Congress is examining an assault on our Constitution
and democratic institutions provoked and fanned by
those sworn to protect them, and the conduct under
investigation extends far beyond typical deliberations
concerning the proper discharge of the President's
constitutional responsibilities. The constitutional
protections of executive privilege should not be used
to shield, from Congress or the public, information
that reflects a clear and apparent effort to subvert the
Constitution itself.

First Remus Ltr., J.A. 107–108.

President Biden specified that his decision "applie[d]
solely" to the documents in the first tranche. First Remus Ltr.,
J.A. 108. After President Trump asserted privilege over some
of the documents, the President advised that, for the reasons
already given, he would "not uphold the former President's
assertion of privilege." Second Remus Ltr., J.A. 113.

14

Citing "the urgency of the Select Committee's need for the information," President Biden instructed the Archivist to provide the relevant pages to the Committee 30 days after its notification to former President Trump. Second Remus Ltr., J.A. 113; *see* 36 C.F.R. § 1270.44(f)(3), (g). Accordingly, on October 13, 2021, the Archivist informed former President Trump that, "as instructed by President Biden," he would disclose to the Committee the privileged pages in the first tranche on November 12, 2021, "absent any intervening court order[.]" J.A. 115; *see* 36 C.F.R. § 1270.44(f)(3). That same day, the Archivist disclosed to the January 6th Committee the 90 pages from the first tranche for which privilege was not claimed. J.A. 126.

On September 9, 2021, the Archivist informed former President Trump that he intended to disclose a second tranche of 742—later reduced to 739—responsive pages. J.A. 127. President Biden was notified shortly thereafter. J.A. 127. Counsel to the President later instructed the Archivist to extend for one week the review period for the second tranche. J.A. 127.

On September 16 and 23, 2021, the Archivist notified former President Trump and President Biden, respectively, of a third tranche of 146 pages. J.A. 127, 130.

Former President Trump subsequently claimed privilege over 724 pages in the second and third tranches combined. J.A. 127, 165–171. Those documents cover "pages from multiple binders containing proposed talking points for the Press Secretary * * * principally relating to allegations of voter fraud, election security, and other topics concerning the 2020 election[,]" "presidential activity calendars and a related handwritten note for January 6, 2021, and for January 2021 generally," the "draft text of a presidential speech for the

15

January 6, 2021, Save America March[,]" "a handwritten note from * * * Meadows' files listing potential or scheduled briefings and telephone calls concerning the January 6 certification and other election issues[,]" and "a draft Executive Order on the topic of election integrity[.]" J.A. 130. They also include "a memorandum apparently originating outside the White House regarding a potential lawsuit by the United States against several states President Biden won[,]" "an email chain originating from a state official regarding election-related issues[,]" "talking points on alleged election irregularities in one Michigan county[,]" "a document containing presidential findings concerning the security of the 2020 presidential election and ordering various actions[,]" and "a draft proclamation honoring the Capitol Police and deceased officers Brian Sicknick and Howard Liebengood, and related emails[.]" J.A. 130–131.

Several days later, President Biden advised the Archivist that he would not assert executive privilege to prevent disclosure or uphold the former President's assertion of privilege for the identified documents in the second and third tranches. The President again concluded that an assertion of executive privilege "is not in the best interests of the United States," reiterating his reasoning from the first letter. Third Remus Ltr., J.A. 173. Citing "the urgency of the Select Committee's need for the information," President Biden instructed the Archivist to provide the contested pages to the Committee 30 days after its notification of former President Trump, unless ordered otherwise by a court. Third Remus Ltr., J.A. 174; *see* 36 C.F.R. § 1270.44(f)(3), (g).

The letter to the Archivist also advised that, "[i]n the course of an accommodation process between Congress and the Executive Branch," the Committee had agreed to defer its

16

request as to fifty pages of responsive records.  J.A. 128;  Third Remus Ltr., J.A. 174.

On October 27, 2021, the Archivist advised former President Trump that he would disclose the 724 pages in the second and third tranches for which a claim of privilege had been made to the January 6th Committee on November 26, 2021, "absent any intervening court order."  J.A. 176.  The Archivist added that he would not provide the documents that President Biden and the January 6th Committee had agreed to set aside.  J.A. 176.

The Archivist's search for presidential records covered by the Committee's request is ongoing, and it "anticipates providing multiple additional notifications * * * on a rolling basis as it is able to locate responsive records."  J.A. 129.

**D**

On October 18, 2021, former President Trump brought suit in the United States District Court for the District of Columbia to halt the disclosure of documents to the January 6th Committee.  He filed suit "solely in his official capacity as a former President[,]" Compl. ¶ 20, J.A. 16, asserting claims under the Presidential Records Act, its regulations, the Declaratory Judgment Act, Executive Order No. 13,489, and the Constitution.  Compl. ¶ 1, J.A. 7.  Former President Trump argued that the Committee's request seeks disclosure of records protected by executive privilege and lacks a valid legislative purpose.  Compl. ¶ 38, 49, 50, J.A. 23–24, 28–29.  He sought a declaratory judgment that the Committee's request is invalid and unenforceable, as well an injunction preventing the Committee "from taking any actions to enforce the request[]" or "using * * * any information obtained as a result of the request[]" and barring the Archivist from "producing the requested information[.]"  Compl. ¶ 54, J.A. 30–31.

17

The next day, Mr. Trump filed a motion for a preliminary injunction "prohibiting Defendants from enforcing or complying with the Committee's request." Pl.'s Mot. for Prelim. Inj. at 1, D. Ct. Dkt. 5. He argued that he is likely to prevail on the ground that the Committee's request "ha[s] no legitimate legislative purpose" and seeks "information that is protected by numerous privileges[,]" *id.* at 2, and that the court was required to conduct an *in camera* review of each assertedly privileged document, Pl.'s Reply at 24, D. Ct. Dkt. 33. He also contended that "the Republic" and "future Presidential administrations" would suffer irreparable harm if the records were released. Mem. in Supp. of Pl.'s Mot. for Prelim. Inj. at 5–6 ("Prelim. Inj. Mem."), D. Ct. Dkt. 5-1.

The district court denied the motion for a preliminary injunction, ruling that former President Trump's "assertion of privilege is outweighed by President Biden's decision not to uphold the privilege," and declining to "second guess that decision by undertaking a document-by-document review[.]" J.A. 197. The court also said that the Committee acted within its legislative authority because its request involves "multiple subjects on which legislation 'could be had[.]'" J.A. 204 (quoting *McGrain v. Daugherty*, 273 U.S. 135, 177 (1927)). The court added that the Committee needs the documents to understand the "circumstances leading up to January 6[,]" and to "identify effective reforms," and that "President Biden's decision not to assert the privilege alleviates any remaining concern that the requests are overly broad." J.A. 207.

As for irreparable injury, the district court found that the former President had not identified any personal interest threatened by production of the records, and that his claim that disclosure would "gravely undermine the functioning of the executive branch" was overtaken by President Biden's determination that the records could safely be released, as well

18

as the long history of past Presidents waiving privilege when it was in the interests of the United States to do so. J.A. 212–213. Lastly, with respect to the balance of harms and public interest, the court concluded that "discovering and coming to terms with the causes underlying the January 6 attack is a matter of unsurpassed public importance[,]" and that "the public interest lies in permitting—not enjoining—the combined will of the legislative and executive branches[.]" J.A. 214–215.

The district court subsequently denied Mr. Trump's request for an injunction pending appeal. D. Ct. Dkt. 43.

**E**

Former President Trump filed an appeal and a motion for both an injunction pending appeal and expedited briefing. Emergency Mot. for Admin. Inj. (Nov. 11, 2021). That same day, this court administratively enjoined the Archivist from releasing the records from the first three tranches over which former President Trump had claimed executive privilege, and set a highly expedited schedule for the preliminary injunction appeal. Per Curiam Order (Nov. 11, 2021).[6]

---

[6] The only privilege at issue in this appeal is the constitutionally based presidential communications privilege. Mr. Trump has not argued that any of the documents for which he has asserted privilege are protected by common-law privileges, and his counsel told the district court that there are no private attorney-client documents among those ready for release. *See* Hearing Tr. 60:21–61:6, D. Ct. Dkt. 41 (Nov. 10, 2021), J.A. 278–279.

19

## II

The district court exercised jurisdiction under 44 U.S.C. § 2204(e) and 28 U.S.C. § 1331.  This court has jurisdiction under 28 U.S.C. § 1292(a)(1).

We review the district court's denial of a preliminary injunction for an abuse of discretion, its legal conclusions *de novo*, and its factual findings for clear error.  *Make the Road New York v. Wolf*, 962 F.3d 612, 623 (D.C. Cir. 2020).

## III

While the underlying lawsuit challenges the full span of the January 6th Committee's request for presidential records, this preliminary injunction appeal involves the narrower question of whether former President Trump's assertion of executive privilege as to a subset of documents in the Archivist's first three tranches requires that those documents be withheld from the Committee.  *See* Oral Arg. Tr. 12:25–13:6.  Those are the only documents for which President Biden has determined that withholding based on executive privilege is not in the interests of the United States, contrary to former President Trump's position.

The Archivist's search for responsive records is ongoing, and there will almost certainly be documents in future tranches over which former President Trump will claim privilege.  But at this early stage of the proceedings, those potential claims of privilege over records in not-yet-extant tranches have not yet been considered by President Biden, nor been subject to interbranch negotiation and accommodation.  Any potential future claims are neither ripe for constitutional adjudication nor capable of supporting this preliminary injunction, since courts should not reach out to evaluate a former President's executive privilege claim based on "future possibilities for constitutional

20

conflict[.]" *Nixon v. Administrator of Gen. Servs.*, 433 U.S. 425, 444–445 (1977); *see also Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 346–348 (1936) (Brandeis, J., concurring) ("The Court will not anticipate a question of constitutional law in advance of the necessity of deciding it.") (internal quotation marks and citation omitted); *cf. Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 217 (1995) (courts should take "the narrower ground for adjudication of the constitutional questions").[7]

To understand the legal dispute, some background on the constitutional interests at stake is in order.

### Congress's Investigative Power

Congress's power to conduct investigations appears nowhere in the text of the Constitution. Yet it is settled law that Congress possesses "the power of inquiry" as "an essential and appropriate auxiliary to the legislative function." *McGrain*, 273 U.S. at 175. That is because "[w]ithout information, Congress would be shooting in the dark, unable to legislate 'wisely or effectively.'" *Trump v. Mazars USA, LLP*, 140 S. Ct. 2019, 2031 (2020) (quoting *McGrain*, 273 U.S. at 174). Congress's power to obtain information is "broad" and

---

[7] The Archivist provided a fourth tranche of roughly 551 pages of responsive records to former President Trump and President Biden in mid-October. *See* J.A. 128. As of now, former President Trump and President Biden have reviewed only a small set of pages from that tranche. *See Records Related to the Request for Presidential Records by the House Select Committee to Investigate the January 6th Attack on the United States Capitol*, NATIONAL ARCHIVES (last updated Nov. 19, 2021), https://www.archives.gov/foia/january-6-committee (last accessed Dec. 7, 2021). Former President Trump asserted executive privilege over six pages, and President Biden has declined to support that assertion. *Id.* Former President Trump has not raised any arguments about those six pages in this appeal.

21

"indispensable[,]" *Watkins v. United States*, 354 U.S. 178, 187, 215 (1957), and "encompasses inquiries into the administration of existing laws, studies of proposed laws, and 'surveys of defects in our social, economic or political system for the purpose of enabling the Congress to remedy them,'" *Mazars*, 140 S. Ct. at 2031 (quoting *Watkins*, 354 U.S. at 187).

Congress's power to investigate has limits, however. Because it is "justified solely as an adjunct to the legislative process[,]" *Watkins*, 354 U.S. at 197, "a congressional subpoena is valid only if it is 'related to, and in furtherance of, a legitimate task of Congress[,]'" *Mazars*, 140 S. Ct. at 2031 (quoting *Watkins*, 354 U.S. at 187). That generally means it must "concern[] a subject on which 'legislation could be had.'" *Eastland v. United States Servicemen's Fund*, 421 U.S. 491, 506 (1975) (quoting *McGrain*, 273 U.S. at 177).

Relatedly, "Congress may not issue a subpoena for the purpose of 'law enforcement,' because 'those powers are assigned under our Constitution to the Executive and the Judiciary.'" *Mazars*, 140 S. Ct. at 2032 (quoting *Quinn v. United States*, 349 U.S. 155, 161 (1955)). Likewise, "there is no congressional power to expose for the sake of exposure." *Watkins*, 345 U.S. at 200.

Finally, "recipients of legislative subpoenas * * * have long been understood [by the courts] to retain common law and constitutional privileges with respect to certain materials, such as * * * governmental communications protected by executive privilege." *Mazars*, 140 S. Ct. at 2032.

Because "Congress's responsibilities extend to 'every affair of government[,]'" its "inquiries might involve the President in appropriate cases[.]" *Mazars*, 140 S. Ct. at 2033 (quoting *United States v. Rumely*, 345 U.S. 41, 43 (1953)).

22

"Historically, disputes over congressional demands for presidential documents" have not involved the courts but, instead, "have been hashed out in the hurly-burly, the give-and-take of the political process between the legislative and the executive." *Mazars*, 140 S. Ct. at 2029 (internal quotation marks and citation omitted).

But when disputes between the President and Congress over records requests have made their way to court, courts have employed carefully tailored balancing tests that weigh the competing constitutional interests. *See Mazars*, 140 S. Ct. at 2035–2036 (asking whether a subpoena for a President's personal records is "related to, and in furtherance of, a legitimate task of Congress" in that (1) the legislative purpose warrants a request for a President's records in particular, (2) the subpoena is not overbroad, (3) Congress has adequately identified a valid legislative purpose, and (4) the subpoena would not unduly burden the President) (quoting *Watkins*, 345 U.S. at 187); *Senate Select Comm. on Presidential Campaign Activities v. Nixon*, 498 F.2d 725, 731 (D.C. Cir. 1974) (weighing a President's assertion of privilege against whether "subpoenaed evidence is demonstrably critical to the responsible fulfillment of the Committee's functions"); *cf. United States v. Nixon*, 418 U.S. 683, 713 (1974) ("The generalized assertion of privilege must yield to the demonstrated, specific need for evidence in a pending criminal trial."). None of those tests, though, have been applied to resolve a privilege dispute between a former President and the joint judgment of the incumbent President and the Legislative Branch.

## ***Executive Privilege***

The canonical form of executive privilege, and the one at issue here, is the presidential communications privilege. That

23

privilege allows a President to protect from disclosure "documents or other materials that reflect presidential decisionmaking and deliberations and that the President believes should remain confidential." *In re Sealed Case*, 121 F.3d 729, 744 (D.C. Cir. 1997); *see United States v. Nixon*, 418 U.S. at 705. The privilege applies not only to materials viewed by the President directly, but also to records "solicited and received by the President or [the President's] immediate White House advisers who have broad and significant responsibility" for advising the President. *Judicial Watch, Inc. v. Department of Justice*, 365 F.3d 1108, 1114 (D.C. Cir. 2004) (internal quotation marks and citation omitted).

This presidential privilege, like Congress's investigative power, is not mentioned in the text of the Constitution. Nonetheless, "presidential claims to such a power go as far back as the early days of the Republic[,]" 26A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE EVIDENCE § 5673 (1st ed. 2021), and the Supreme Court has concluded that "the silence of the Constitution on this score is not dispositive," *United States v. Nixon*, 418 U.S. at 705 n.16. Instead, an implied executive privilege "derives from the supremacy of the Executive Branch within its assigned area of constitutional responsibilities," *Nixon v. GSA*, 433 U.S. at 447, is "fundamental to the operation of Government[,] and [is] inextricably rooted in the separation of powers under the Constitution," *United States v. Nixon*, 418 U.S. at 708.

The executive privilege is just that—a privilege held by the Executive Branch, "not for the benefit of the President as an individual, but for the benefit of the Republic." *Nixon v. GSA*, 433 U.S. at 449 (citation omitted). Because "[a] President and those who assist him must be free to explore alternatives in the process of shaping polices and making decisions and to do so in a way many would be unwilling to

24

express except privately," *United States v. Nixon*, 418 U.S. at 708, the privilege "safeguards the public interest in candid, confidential deliberations within the Executive Branch," *Mazars*, 140 S. Ct. at 2032.

But the executive privilege is a qualified one; it is not "absolute[.]"   *United States v. Nixon*, 418 U.S. at 707. Executive privilege may be overcome by "a strong showing of need by another institution of government[.]"  *Senate Select Comm.*, 498 F.2d at 730; *see also United States v. Nixon*, 418 U.S. at 707.  And the privilege may give way in the face of other "strong constitutional value[s,]" *Dellums v. Powell*, 561 F.2d 242, 247 (D.C. Cir. 1977), such as "the fundamental demands of due process of law" in criminal trials, *United States v. Nixon*, 418 U.S. at 713; *see also Protect Democracy Project, Inc. v. National Security Agency*, 10 F.4th 879, 886 (D.C. Cir. 2021).

Despite its unquestioned significance, executive privilege also can be waived.  The historical record documents numerous instances in which Presidents have waived executive privilege in times of pressing national need.  *See* page 41, *infra* (providing examples).

The privilege, like all other Article II powers, resides with the sitting President.  Nevertheless, in *Nixon v. GSA*, the Supreme Court held that former Presidents retain for some period of time a right to assert executive privilege over documents generated during their administrations.  433 U.S. at 449, 451.  The Court held that this residual right protects only "the confidentiality required for the President's conduct of office[,]" rather than any personal interest in nondisclosure.  *Id*. at 448.

In addition, when it comes to evaluating the impact on the Executive Branch of disclosing presidential materials, the

25

Supreme Court was explicit that the incumbent President is "in the best position to assess the present and future needs of the Executive Branch[.]"  *Nixon v. GSA*, 433 U.S. at 449.[8]

### *The Management of Presidential Records: Statutory Provisions*

Starting with George Washington, "Presidents exercised complete dominion and control over their presidential papers" after leaving office.  *Nixon v. United States*, 978 F.2d 1269, 1277 (D.C. Cir. 1992).  This tradition "made for a highly idiosyncratic if not entirely unhappy record of preserving the papers of United States Presidents."  NATIONAL STUDY COMM'N ON RECORDS & DOCUMENTS OF FED. OFFICIALS, MEMORANDUM OF FINDINGS ON EXISTING CUSTOM OR LAW, FACT AND OPINION 3 (undated), *reprinted in Presidential Records Act of 1978:  Hearings on H.R. 10998 and Related Bills Before a Subcomm. of the H. Comm. on Gov't Operations*, 95th Cong. 467, 469 (1978).

Following the Watergate scandal and the resignation of President Richard Nixon, Congress passed the Presidential Recordings and Materials Preservation Act ("Preservation Act"), which focused exclusively on former President Nixon's tape recordings, papers, and other historical materials from his term in office.  *See* Pub. L. No. 93-526, § 101, 88 Stat. 1695 (1974).  The Preservation Act required the General Services Administrator to "receive, retain, or make reasonable efforts to obtain, complete possession and control of" those historical materials, and make them publicly "available, subject to any

---

[8] Like the Supreme Court, we treat the terms "presidential privilege," "presidential communications privilege," and "executive privilege" as interchangeable for purposes of this case.  *See Nixon v. GSA*, 433 U.S. at 446 n.9; *see also Dellums*, 561 F.2d at 245 n.8.

26

rights, defenses, or privileges which the Federal Government or any person may invoke, for use in any judicial proceeding or otherwise subject to court subpena [*sic*] or other legal process." *Id.* §§ 101, 102, 88 Stat. at 1695–1696; *see* 44 U.S.C. § 2111 note.[9]

Four years later, Congress enacted the Presidential Records Act of 1978.  That Act provides that, as of January 21, 1981, the United States "shall reserve and retain complete ownership, possession, and control of Presidential records."  44 U.S.C. § 2202 & note.  The Act defines "Presidential records" as:

> [D]ocumentary materials, or any reasonably segregable portion thereof, created or received by the President, the President's immediate staff, or a unit or individual of the Executive Office of the President whose function is to advise or assist the President, in the course of conducting activities which relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or ceremonial duties of the President.

*Id.* § 2201(2).  "[P]ersonal records" of a President, defined as documentary materials "of a purely private or nonpublic character which do not relate to or have an effect upon the carrying out of the constitutional, statutory, or other official or

---

[9] The Archivist of the National Archives and Records Administration replaced the Administrator of the General Services Administration in 1984.  *See Public Citizen v. Burke*, 843 F.2d 1473, 1475 (D.C. Cir. 1988); National Archives and Records Administration Act of 1984, Pub. L. No. 98-497, § 103(b)(2), 98 Stat. 2280, 2283.

27

ceremonial duties of the President[,]" are excluded from regulation. *Id*. § 2201(3).

Under the Presidential Records Act, once a President's time in office concludes, the "Archivist of the United States shall assume responsibility for the custody, control, and preservation of, and access to, the Presidential records of that President." 44 U.S.C. § 2203(g)(1). The Archivist has "an affirmative duty to make such records available to the public as rapidly and completely as possible consistent with the provisions" of the Presidential Records Act. *Id.* § 2203(g)(1).

The Act provides former Presidents with some protection against public disclosure. Specifically, the Act allows a President, when leaving office, to restrict for up to twelve years public access to records that (1) are classified and involve national defense or foreign policy, (2) relate to appointments to public office, (3) are exempt from disclosure under certain federal statutes, (4) contain trade secrets or other privileged or confidential commercial or financial information obtained from a person, (5) constitute "confidential communications requesting or submitting advice, between the President and the President's advisers, or between such advisers[,]" or (6) personnel, medical, and similar files implicating personal privacy. 44 U.S.C. § 2204(a) & (a)(1)–(a)(6); *see also* 36 C.F.R. § 1270.40(a).

The Act tasks the Archivist with properly designating "[a]ny Presidential record or reasonably segregable portion thereof containing information within a category restricted by the President[,]" and preventing public access to those documents until the appropriate time. 44 U.S.C. § 2204(b)(1); *see also* 36 C.F.R. § 1270.40(c). The Presidential Records Act precludes judicial review of the Archivist's designations "[d]uring the period of restricted access[,]" except for "any

28

action initiated by the former President asserting that a determination made by the Archivist violates the former President's rights or privileges." 44 U.S.C. § 2204(b)(3), (e).

Relevant to this case, under the Presidential Records Act, those restrictions on public access do not apply, and the Archivist "shall" provide access to presidential records, when the documents are:

- subpoenaed or subjected to other judicial process by a court as part of a civil or criminal proceeding;

- requested by an incumbent President "if such records contain information that is needed for the conduct of current business of the incumbent President's office and that is not otherwise available"; or

- requested by either House of Congress or a committee acting within its jurisdiction and the information is "needed for the conduct of its business and [is] not otherwise available[.]"

44 U.S.C. § 2205(2)(A)–(C).  Disclosure under this section is "subject to any rights, defenses, or privileges which the United States or any agency or person may invoke[.]"  *Id*. at § 2205(2).

### *The Management of Presidential Records: Regulatory Provisions*

Under the Preservation Act, the National Archives and Records Administration promulgated regulations providing that the Archivist would decide which assertions of "legal or constitutional right[s] or privilege[s]" would "prevent or limit public access" to the presidential records of former President Nixon.  *See* 36 C.F.R. §§ 1275.26(g), 1275.44(a) (1987).

29

The Department of Justice's Office of Legal Counsel interpreted those regulations as requiring that "the Archivist must and will honor any claim of executive privilege asserted by an incumbent President, * * * [and] that the Archivist must and will treat any claim by a former President" in accordance with "the supervision and control of the incumbent President." Memorandum from Charles J. Cooper, Assistant Attorney General, Office of Legal Counsel, Department of Justice, to Robert P. Bedell, Deputy Administrator, Office of Information and Regulatory Affairs, Office of Management. and Budget 23–24, 26 (Feb. 18, 1986), *reprinted in Review of Nixon Presidential Materials Access Regulations: Hearing Before a Subcomm. of the H. Comm. on Gov't Operations,* 99th Cong. 263–292 (1986) ("1986 OLC Memorandum"); *see Public Citizen v. Burke*, 843 F.2d 1473, 1476–1477 (D.C. Cir. 1988).

In the view of the Office of Legal Counsel, the incumbent President "should respect a former President's claim of executive privilege without judging the validity of the claim[,]" leaving the "judgment regarding such a claim * * * to the judiciary in litigation between the former President and parties seeking disclosure." 1986 OLC Memorandum at 26. The OLC memorandum acknowledged, though, that "if the incumbent President believes that the discharge of his [or her] constitutional duties * * * demands the disclosure of documents claimed by the former President to be privileged, it may be necessary for [the President]  to oppose a former President's claim" even if "it is generally not appropriate for an incumbent President to review and adjudicate the merits of a predecessor's claim of executive privilege[.]"  *Id.*; *see also Burke*, 843 F.2d at 1478–1479.  In that event, the Archivist would be obliged to follow the direction of the incumbent President.  1986 OLC Memorandum at 24, 26; *see Burke*, 843 F.2d at 1478–1479.

30

In *Public Citizen v. Burke*, this court held that the Office of Legal Counsel's interpretation was neither constitutionally required nor compatible with the Preservation Act. 843 F.2d at 1479–1480. We ruled that "the incumbent President is not constitutionally obliged to honor former President Nixon's invocation of executive privilege with respect to the Nixon papers[.]" *Id*. at 1479. Rather, it was the incumbent President's duty under the Preservation Act to "consider the host of difficult questions that arise in this area," even if that meant being put in the "awkward position" of taking "a position on claims of executive privilege put forward by former President Nixon." *Burke*, 843 F.2d at 1479.

Meanwhile, the Presidential Records Act had tasked the Archivist with promulgating regulations for the provision of notice to a former President when materials for which access had been restricted are sought by a court, the President, or Congress under 44 U.S.C. § 2205(2), and "when the disclosure of particular documents may adversely affect any rights and privileges which the former President may have[.]" 44 U.S.C. § 2206(2)–(3).

The Archivist promulgated those regulations in 1988. *See* 36 C.F.R. Pt. 1270 (1989). The regulations required the Archivist to notify a former President or the former President's designated representative "before any Presidential records of his [or her] Administration [were] disclosed" either to the public or under Section 2205, including releases to Congress and its committees. 36 C.F.R. § 1270.46(a) (1989). If then "a former President raise[d] rights or privileges which he [or she] believe[d] should preclude the disclosure of a Presidential record," but the Archivist decided that the record still should be disclosed, "in whole or in part," the Archivist was required

to give notice to the former President or the President's representative. *Id.* § 1270.46(c).

Shortly after those regulations were promulgated, President Ronald Reagan issued an Executive Order that expanded on the process for responding to a former President's invocation of privilege. *See* Exec. Order No. 12,667, 54 Fed. Reg. 3403 (Jan. 18, 1989); *see also* 44 U.S.C. § 2204 note. Under that Executive Order, when the incumbent President invoked executive privilege, the Archivist was prohibited from disclosing the records "unless directed to do so by an incumbent President or by a final court order." Exec. Order No. 12,667 § 3(d). If a former President invoked executive privilege, but the incumbent did not, the Archivist was charged with determining "whether to honor the former President's claim of privilege[.]" *Id*. § 4(a). In making that determination, though, the Archivist was bound to "abide by any instructions given him [or her] by the incumbent President or [the President's] designee unless otherwise directed by a final court order." *Id*. § 4(b).

President Reagan's Executive Order governed the handling of privilege claims by former Presidents for more than a decade. *See* 44 U.S.C. § 2204 note.

In 2001, President George W. Bush issued an Executive Order that took a different tack. Exec. Order No. 13,233, 66 Fed. Reg. 56,025 (Nov. 1, 2001); *see* 44 U.S.C. § 2204 note.

For disclosures to Congress or one of its committees under 44 U.S.C. § 2205(2)(C), the new Executive Order provided that the "Archivist shall not permit access to the records unless and until * * * the former President *and* the incumbent President agree to authorize access" or a "final and nonappealable court order" requires it. Exec. Order No. 13,233 § 6 (emphasis

32

added).  While that new procedure reflected President Bush's view of proper policy, the Administration was explicit that such deference to a former President was not constitutionally compelled and would not affect a court's disposition of a lawsuit by the former President.  *See Hearings on Executive Order 13,233 and the Presidential Records Act Before the Subcomm. of the H. Comm. on Gov't Reform*, 107th Cong. 20, 108 (2001–2002) ("*Executive Order 13,233 Hearings*") (statement of M. Edward Whelan III, Acting Assistant Attorney General, Office of Legal Counsel, Department of Justice); *id.* at 21 ("Let me emphasize, moreover, that the Executive order is wholly procedural in nature."  It does not "in any respect purport to redefine the substantive scope of any constitutional privilege.").[10]  In addition, the incumbent President need not "support that privilege claim" in the "forum in which the privilege claim is challenged."  Exec. Order No. 13,233 § 4.[11]

President Barack Obama returned to the procedures established by President Reagan.  Exec. Order No. 13,489, 74 Fed. Reg. 4669 (Jan. 21, 2009); *see* 44 U.S.C. § 2204 note.

In 2014, Congress largely codified the approach of the Reagan Executive Order.  The Presidential and Federal Records Act Amendments of 2014, Pub. L. No. 113-187, 128 Stat. 2003, provided detailed procedures for protecting and

---

[10] Mr. Trump has not argued that the Constitution requires that the views of a former President unilaterally control.  Nor could he.  *See Nixon v. GSA*, 433 U.S. at 449; *Burke*, 843 F.2d at 1479; *Nixon v. United States*, 978 F.2d at 1272.

[11] The Executive Order provided that the incumbent President "will support" the former President's privilege claim only when he concurs in the assertion of privilege and access is sought by the public under 44 U.S.C. § 2204(c)(1).  Exec. Order No. 13,233 § 4.

33

asserting claims of "constitutionally based privilege" against disclosure "to the public" of presidential records. *Id*. § 2; 44 U.S.C. § 2208 (procedures for public disclosure). The 2014 Amendments provide that, if "the incumbent President determines not to uphold the claim of privilege asserted by the former President," then "the Archivist *shall* release the Presidential record subject to the claim" at the end of a 90-day period unless otherwise directed by a court order. 44 U.S.C. § 2208(c)(2)(C) (emphasis added).

The 2014 amendments did not expressly extend those notification procedures to disclosures to Congress, the incumbent President, or the judiciary under Section 2205. But under the Trump Administration, the National Archives promulgated regulations "ensur[ing] that the former and incumbent Presidents are given notice and an opportunity to consider whether to assert a constitutionally based privilege" when disclosure is sought under Section 2205. Presidential Records, 82 Fed. Reg. 26,588, 26,589 (June 8, 2017). Under those regulations, the Archivist must "promptly notif[y] the President * * * during whose term of office the record was created, and the incumbent President" of a document request by, *inter alia*, "either House of Congress, or * * * a congressional committee or subcommittee" under 44 U.S.C. § 2205(2)(c). 36 C.F.R. § 1270.44(a)(3), (c). Once notified, "either President may assert a claim of constitutionally based privilege against disclosing the record or a reasonably segregable portion of it within 30 calendar days after the date of the Archivist's notice." *Id*. § 1270.44(d).

If the incumbent President maintains a privilege claim, the Archivist may not disclose the document absent court order. 36 C.F.R. § 1270.44(e)(2). On the other hand, if the former President asserts privilege, the Archivist must consult with the incumbent President "to determine whether the incumbent

34

President will uphold the claim." 36 C.F.R. § 1270.44(f)(1). If the incumbent President upholds and maintains the claim, then the Archivist may not disclose the presidential record without a court order. *Id*. § 1270.44(f)(2). If the incumbent President does not uphold or withdraws the privilege claim or fails to decide within 30 days, the Archivist must "disclose[] the Presidential record" after a 60-day time period, unless a court orders otherwise. *Id.* § 1270.44(f)(3).

So for 24 years of the Presidential Records Act's operation and across five different presidencies, Presidents, including former President Trump, have agreed that the disclosure decision of an incumbent President controls within the Executive Branch over the contrary claim of a former President. And all Presidents have agreed that the Constitution does not obligate an incumbent President or court to uphold the views of a former President. *See Burke*, 843 F.2d at 1479.

## IV

With that background in mind, we turn to the merits of former President Trump's appeal. Our starting point is the Supreme Court's admonition that a preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). The movant must: (1) establish a likelihood of "succe[ss] on the merits"; (2) show "irreparable harm in the absence of preliminary relief"; (3) demonstrate that the equities favor issuing an injunction; and (4) persuade the court that "an injunction is in the public interest." *Id.* at 20. The likelihood of success and irreparability of harm "are the most critical" factors. *Nken v. Holder*, 556 U.S. 418, 434 (2009). The balance of harms and the public interest factors merge when the government is the opposing party. *Id*. at 435.

35

On this record, former President Trump has failed to satisfy any of those criteria for preliminary injunctive relief.

**A**

There is no question that the former President can file suit to press his claim of executive privilege. The Supreme Court in *Nixon v. GSA* specifically "reject[ed] the argument that only an incumbent President may assert such claims" and ruled that "a former President[] may also be heard to assert them" in court. 433 U.S. at 439. The Court explained that executive privilege "is necessary to provide the confidentiality required for the President's conduct of office" because, "[u]nless he can give his advisers some assurance of confidentiality, a President could not expect to receive the full and frank submissions of facts and opinions upon which effective discharge of his duties depends." *Id.* at 448–449. "[T]he privilege survives the individual President's tenure[,]" the Court said, because the "privilege is not for the benefit of the President as an individual, but for the benefit of the Republic." *Id.* at 449 (internal quotation marks and citation omitted). So the privilege that Mr. Trump asserts in his capacity as a former President is of constitutional stature.

The Presidential Records Act reflects that understanding by providing that a former President may initiate an action "asserting that a determination made by the Archivist violates the former President's rights or privileges." 44 U.S.C. § 2204(e). And "[n]othing in [the] Act shall be construed to * * * limit * * * any constitutionally-based privilege which may be available to a[] * * * former President." *Id.* at § 2204(c)(2).

36

**B**

While former President Trump can press an executive privilege claim, the privilege is a qualified one, as he agrees. *See Nixon v. GSA*, 433 U.S. at 446; *United States v. Nixon*, 418 U.S. at 707; Appellant Opening Br. 35.  Even a claim of executive privilege by a sitting President can be overcome by a sufficient showing of need.  *See United States v. Nixon*, 418 U.S. at 713; *In re Sealed Case*, 121 F.3d at 292.  The right of a former President certainly enjoys no greater weight than that of the incumbent.

In cases concerning a claim of executive privilege, the bottom-line question has been whether a sufficient showing of need for disclosure has been made so that the claim of presidential privilege "must yield[.]"  *Nixon v. GSA*, 433 U.S. at 454; *see United States v. Nixon*, 418 U.S. at 706, 713.[12]

In this case, President Biden, as the head of the Executive Branch, has specifically found that Congress has demonstrated a compelling need for these very documents and that disclosure is in the best interests of the Nation.  Congress, which has engaged in a course of negotiation and accommodation with the President over these documents, agrees.  So the tests that courts have historically used to police document disputes between the Political Branches seem a poor fit when the Executive and Congress together have already determined that the "demonstrated and specific" need for disclosure that former President Trump would require, Appellant Opening Br. 35, has been met.  A court would be hard-pressed under these circumstances to tell the President that he has miscalculated the

---

[12] Mr. Trump's counsel agrees that this standard governs.  *See* Oral Arg. Tr. 34:23–25; Appellant Opening Br. 35 ("[T]he executive privilege * * * can only be invaded pursuant to a demonstrated and specific showing of need[.]").

37

interests of the United States, and to start an interbranch conflict that the President and Congress have averted.

But we need not conclusively resolve whether and to what extent a court could second guess the sitting President's judgment that it is not in the interests of the United States to invoke privilege. Under any of the tests advocated by former President Trump, the profound interests in disclosure advanced by President Biden and the January 6th Committee far exceed his generalized concerns for Executive Branch confidentiality.

**1**

On this record, a rare and formidable alignment of factors supports the disclosure of the documents at issue. President Biden has made the considered determination that an assertion of executive privilege is not in the best interests of the United States given the January 6th Committee's compelling need to investigate and remediate an unprecedented and violent attack on Congress itself. Congress has established that the information sought is vital to its legislative interests and the protection of the Capitol and its grounds. And the Political Branches are engaged in an ongoing process of negotiation and accommodation over the document requests.

**a**

President Biden's careful and cabined assessment that the best interests of the Executive Branch and the Nation warrant disclosing the documents, by itself, carries immense weight in overcoming the former President's assertion of privilege.

To start, as the incumbent, President Biden is the principal holder and keeper of executive privilege, and he speaks authoritatively for the interests of the Executive Branch. Under our Constitution, we have one President at a time. Article II is

38

explicit that "[t]he executive Power shall be vested in *a* President of the United States of America." U.S. CONST. Art. II, § 1, cl. 1 (emphasis added); *see Seila Law LLC v. Consumer Fin. Prot. Bureau*, 140 S. Ct. 2183, 2191 (2020) ("[T]he 'executive Power'—all of it—is 'vested in *a* President[.]'") (emphasis added) (quoting U.S. CONST., Art. II, § 1, cl. 1). As between a former and an incumbent President, "only the incumbent is charged with performance of the executive duty under the Constitution." *Nixon v. GSA*, 433 U.S. at 448.

To be sure, former President Trump has important insight on the value of preserving the confidentiality of records created during his administration. But it is only President Biden who can make a fully informed and circumspect assessment of all the competing needs and interests of the Executive Branch. These might include (to name just a few) the current and prospective threats to democratic institutions and the electoral process, intelligence on domestic extremists, the full panoply of competing privilege claims and disputes between the Executive Branch and Congress, the sensitive status of interbranch relations at multiple levels, and the costs and benefits of a privilege battle or disclosure at the time the matter arises.

The Supreme Court underscored this point when it held, in rejecting a claim of executive privilege by another former President, that "it must be presumed that the incumbent President is vitally concerned with and in the best position to assess the present and future needs of the Executive Branch, and to support invocation of the privilege accordingly." *Nixon v. GSA*, 433 U.S. at 449; *see also Dellums*, 561 F.2d at 247 ("[I]t is the new President who has the information and attendant duty of executing the laws in light of current facts and circumstances, and who has the primary * * * responsibility of deciding when presidential privilege must be claimed[.]").

39

So President Biden's explicit and informed judgment "detracts from the weight of" former President Trump's view that disclosure in these circumstances "impermissibly intrudes into the executive function and the needs of the Executive Branch." *Nixon v. GSA*, 433 U.S. at 449.

In addition, President Biden has identified weighty reasons for declining to assert privilege here. He grounded his decision in the "unique and extraordinary circumstances" of the January 6th attack—"an unprecedented effort to obstruct the peaceful transfer of power" that "threaten[ed] not only the safety of Congress and others present at the Capitol, but also the principles of democracy enshrined in our history and our Constitution." First Remus Ltr., J.A. 107–108. President Biden further emphasized Congress's "compelling need in service of its legislative functions to understand the circumstances that led to these horrific events." First Remus Ltr., J.A. 107. President Biden also tied his decision to "[t]he available evidence to date[,]" which he concluded "establishes a sufficient factual predicate for the Select Committee's investigation" of these presidential papers. First Remus Ltr., J.A. 107. Finally, President Biden acknowledged the "constitutional protections of executive privilege[,]" but explained that "the conduct under investigation extends far beyond typical deliberations concerning the proper discharge of the President's constitutional responsibilities[,]" and the privilege "should not be used to shield * * * information that reflects a clear and apparent effort to subvert the Constitution." First Remus Ltr., J.A. 108; *see also* Second Remus Ltr., J.A. 113; Third Remus Ltr., J.A. 173–174.

The record also shows that, for the documents over which the former President asserted privilege, President Biden and his staff took at least a month to review each tranche. *See* J.A. 125–128. During that time, former President Trump's views

40

were obtained.  J.A. 13.  In addition, the sitting President and the Committee reached compromises under which the Committee deferred its request for some documents.  J.A. 128, 176.

On this record, we cannot credit the former President's argument that President Biden's calibrated judgment is merely "the whim[] of [a] sitting President who may be unable [to] see past his own political considerations."  Appellant Opening Br. 17.  Indeed, President Biden's care to limit his decision to the particular documents that "shed light on events within the White House on and about January 6[,]" First Remus Ltr., J.A. 107; *see also* Second Remus Ltr., J.A. 113; Third Remus Ltr., J.A. 173–174, bears no resemblance to the "broad and limitless waiver" of executive privilege former President Trump decries, Appellant Opening Br. 35.

That is not to say, of course, that an incumbent President *must* provide a written explanation for a former President's claim of privilege to fail.  In *Nixon v. GSA*, the incumbent President had not provided such an explanation, but instead had simply chosen to defend the facial constitutionality of the Preservation Act in court.  *See* 443 U.S. at 441.  And in *Dellums*, the incumbent was silent as to privilege.  561 F.2d at 247.

Still, when the head of the Executive Branch lays out the type of thoroughgoing analysis provided by President Biden, the scales tilt even more firmly against the contrary views of the former President.  For Article III courts are generally ill-equipped to superintend or second guess the expert judgment of the sitting President about the current needs of the Executive Branch and the best interests of the United States on matters of such gravity and so squarely within the President's Article II discretion.

41

President Biden's explanation also makes clear that his decision respects and preserves the strong constitutional reasons for executive privilege at the heart of the former President's objection. Here, the letter shows that President Biden's judgment is of a piece with decisions made by other Presidents to waive privilege in times of pressing national need. For example, President Nixon decided that executive privilege would "not be invoked as to any testimony concerning * * * discussions of possible criminal conduct" as part of the Senate Select Committee's investigation of Watergate. Statements About the Watergate Investigations, 1973 PUB. PAPERS 547, 554 (May 22, 1973). During congressional investigations into the Iran-Contra affair, President Reagan authorized testimony and the production of documents, including excerpts from his personal diaries. *See* REPORT OF THE CONGRESSIONAL COMMITTEES INVESTIGATING THE IRAN-CONTRA AFFAIR, H.R. REP. No. 100-433, S. REP. No. 100-216, at xvi (1987). In the aftermath of the September 11th attacks, President Bush and Vice President Richard Cheney sat for a more than three-hour interview with the commission investigating the attacks.[13] And President Trump himself chose not to invoke privilege to prevent former FBI Director James Comey from testifying before Congress, despite (borne out) expectations that the testimony would include Comey's recollections of confidential conversations with President Trump.[14]

---

[13] Philip Shenon & David E. Sanger, *Bush & Cheney Tell 9/11 Panel of '01 Warnings*, N.Y. TIMES (April 30, 2004), https://perma.cc/QD2N-MAVX; *see* NATIONAL COMM'N ON TERRORIST ATTACKS UPON THE UNITED STATES, THE 9/11 COMMISSION REPORT, at xv (2004).

[14] Peter Baker, *Trump Will Not Block Comey From Testifying, White House Says*, N.Y. TIMES (June 5, 2017), https://perma.cc/B93T-8STK.

42

In short, President Biden's considered judgment that the interests of the United States and the interests of the Executive Branch favor disclosure in this instance substantially "detracts from the weight of" former President Trump's contrary privilege contention.  *Nixon v. GSA*, 433 U.S. at 449.

**b**

Also countering former President Trump's claim is Congress's uniquely weighty interest in investigating the causes and circumstances of the January 6th attack so that it can adopt measures to better protect the Capitol Complex, prevent similar harm in the future, and ensure the peaceful transfer of power.  The Presidential Records Act requires that the January 6th Committee show that presidential records are "needed for the conduct of its business[.]"    44 U.S.C. § 2205(2)(C).    The Committee has comfortably met that standard here.

The very essence of the Article I power is legislating, and so there would seem to be few, if any, more imperative interests squarely within Congress's wheelhouse than ensuring the safe and uninterrupted conduct of its constitutionally assigned business.  Here, the House of Representatives is investigating the single most deadly attack on the Capitol by domestic forces in the history of the United States.  Lives were lost; blood was shed; portions of the Capitol building were badly damaged; and the lives of members of the House and Senate, as well as aides, staffers, and others who were working in the building, were endangered.    They were forced to flee, preventing the legislators from completing their constitutional duties until the next day.

The January 6th Committee has also demonstrated a sound factual predicate for requesting these presidential documents specifically.    There is a direct linkage between the former

43

President and the events of the day. Then-President Trump
called for his supporters to gather in Washington, D.C. for a
"wild" response to what he had been alleging for months was a
stolen election. Donald Trump (@realDonaldTrump),
TWITTER (Dec. 19, 2020, 1:42 AM). On January 6th, President
Trump directed his followers to go to the Capitol and "fight"
for their Country with the aim of preventing Congress's
certification of the electoral vote. January 6th Rally Speech at
3:47:20 ("[Y]ou'll never take back our country with weakness.
* * * We have come to demand that Congress do the right thing
and only count" certain electors.), 4:41:28.

The White House is also the hub for intelligence about
threats of violent action against the government, and the
Executive Branch is in charge of federal law enforcement and
mobilizing the National Guard to defend the Capitol. *See* U.S.
CONST. Art. II, § 2, cl. 1; D.C. Code § 49-409. So information
from within the White House is critical to understanding what
intelligence failures led the government to be underprepared
for such a violent attack, and what can be done to expedite the
mobilization of law enforcement forces in a crisis on Capitol
Hill going forward. H.R. Res. 503 § 4(a)(2)(A)–(B), (c).
Given all of that, the Committee has sound reasons for seeking
presidential documents in particular as part of its investigation
into the causes of the attack on the Capitol.

The Supreme Court's decision in *Nixon v. GSA* makes
clear that Congress's interests go far in outweighing the former
President's privilege claim. In *Nixon v. GSA*, the Court found
a "substantial public interest[]" in "Congress' need to
understand how those political processes [in the Watergate
scandal] had in fact operated in order to g[au]ge the necessity
for remedial legislation" and "to restore public confidence in
our political processes[.]" 433 U.S. at 453. In that way, the
Court explained, Congress's efforts to preserve and afford

44

access to presidential records "may be thought to aid the legislative process and thus to be within the scope of Congress' broad investigative power[.]"  *Id.*    These "important" congressional interests in coming to terms with the Watergate scandal supported the Court's conclusion that the former President's claims of executive privilege "must yield[.]"  *Id.* at 454.

So too here, the January 6th Committee's access to the requested materials is vital to Congress's own evaluation of whether the process for transferring power between administrations is "characterized by deficiencies susceptible of legislative correction[,]" *Nixon v. GSA*, 433 U.S. at 499 (Powell, J., concurring).

Keep in mind that the "presumptive privilege" for presidential communications "must be considered in light of our historic commitment to the rule of law."  *United States v. Nixon*, 418 U.S. at 708.  In *United States v. Nixon*, the particular component of the rule of law that overcame a *sitting* President's assertion of executive privilege was the "right to every [person]'s evidence" in a criminal proceeding.  *Id.* at 709 (quoting *Branzburg v. Hayes*, 408 U.S. 665, 688 (1972)). Allowing executive privilege to prevail over that principle would have "gravely impair[ed] the basic function of the courts."  *Id.* at 712.

An equally essential aspect of the rule of law is the peaceful transition of power, and the constitutional role prescribed for Congress by the Twelfth Amendment in verifying the electoral college vote.  To allow the privilege of a no-longer-sitting President to prevail over Congress's need to investigate a violent attack on its home and its constitutional operations would "gravely impair the basic function of the" legislature.  *United States v. Nixon*, 418 U.S. at 712.

45

**c**

Weighing still more heavily against former President Trump's claim of privilege is the fact that the judgment of the Political Branches is unified as to these particular documents. President Biden agrees with Congress that its need for the documents at issue is "compelling[,]" and that it has a "sufficient factual predicate" for requesting them.  First Remus Ltr., J.A. 107; *see also* Third Remus Ltr., J.A. 173.  As a result, blocking disclosure would derail an ongoing process of accommodation and negotiation between the President and Congress, and instigate an interbranch dispute.

The Supreme Court has emphasized the importance of courts deferring to information-sharing agreements wrestled over and worked out between Congress and the President.  *See Mazars*, 140 S. Ct. at 2029, 2031.  Historically, "disputes over congressional demands for presidential documents have not ended up in court[,]" but rather "have been hashed out in the 'hurly-burly, the give-and-take of the political process between the legislative and the executive,'" *id.* at 2029 (citation and internal quotation marks omitted), generally allowing the courts to avoid being drawn into the power struggle.  That "hurly-burly" is a flexible, dynamic process that could involve interlocking and contingent negotiations over multiple different requests for information, the President's legislative priorities, nominations and confirmations, and the many other complementary and competing interests and responsibilities of those two Branches.

In that "tradition of negotiation and compromise[,]" the Executive and Legislative Branches have reached an accommodation here.  *Mazars*, 140 S. Ct. at 2031.  President Biden and Congress have come to an agreement that the pressing needs of the January 6th Committee and the interests

46

of the United States warrant a limited disclosure of the documents for which privilege has been asserted. That arrangement reflects give-and-take, as the Committee agreed to defer its request for fifty pages of responsive records from the second and third tranches. J.A. 170, 176.

Former President Trump states that he too was engaged in negotiations with the White House. But he abruptly stopped them when the decision to release documents from the first tranche was made. Compl. ¶¶ 15–16, J.A. 13–15. And even though, in the past, committees have sometimes "agreed to restrictions on the type of access provided" to privileged documents, such as "read-only access or committee-confidential restrictions[,]" Laster Decl., J.A. 124, former President Trump makes no showing of having requested such restrictions from the Committee or White House, and his counsel admitted that he did not propose a more limited injunction along those lines, *see* Oral Arg. Tr. 36–37.

In short, confronting former President Trump's claim of privilege is the hydraulic constitutional force of not only a reasoned decision by the President that a limited release is in the interests of the United States, and the uniquely compelling need of Congress for this information, but also this court's "duty of care to ensure that we not needlessly disturb 'the compromises and working arrangements that those [Political] branches themselves have reached.'" *Mazars*, 140 S. Ct. at 2031 (formatting modified; quoting *NLRB v. Noel Canning*, 573 U.S. 513, 524–526 (2014)).

**2**

That accumulation of forces favoring disclosure is at least equal to, if not greater than, what has supported the disclosure of the privileged materials of even a sitting President. To establish a likelihood of success in prevailing, then, former

47

President Trump bears the burden of at least showing some weighty interest in continued confidentiality that could be capable of tipping the scales back in his favor, and of "mak[ing] particularized showings in justification of his claims of privilege[.]" *Senate Select Comm.*, 498 F.2d at 730. He has not done so. He has not identified any specific countervailing need for confidentiality tied to the documents at issue, beyond their being presidential communications. Neither has he presented arguments that grapple with the substance of President Biden's and Congress's weighty judgments. Nor has he made even a preliminary showing that the content of any particular document lacks relevance to the Committee's investigation. He offers instead only a grab-bag of objections that simply assert without elaboration his superior assessment of Executive Branch interests, insists that Congress and the Committee have no legitimate legislative interest in an attack on the Capitol, and impugns the motives of President Biden and the House. That falls far short of meeting his burden and makes it impossible for this court to find any likelihood of success.

**a**

Because Mr. Trump has sued solely in his "official capacity" as the "45th President of the United States[,]" Compl. ¶ 20, J.A. 16, he does not assert that disclosure of the documents before us would harm any personal interests in privacy or confidentiality. His sole objection is that disclosure would "burden[] the presidency generally[,]" in light of the need for "candid advice" and the potential for a "chilling effect[.]" Appellant Opening Br. 29. In support of this claim, he presses the undisputed points that the confidentiality of presidential communications protects "the proper functioning of the government" and "ensure[s] full and frank advice" for future Presidents. Appellant Opening Br. 14, 36.

48

That is all he offers. And that is not close to enough. When a former and incumbent President disagree about the need to preserve the confidentiality of presidential communications, the incumbent's judgment warrants deference because it is the incumbent who is "vitally concerned with and in the best position to assess the present and future needs of the Executive Branch[.]" *Nixon v. GSA*, 433 U.S. at 449. Mr. Trump's disagreement with President Biden's judgment, by itself, provides the court no basis to override the sitting President's judgment.

Nor is such a "generalized interest in confidentiality," *United States v. Nixon*, 418 U.S. at 711, sufficient for a court to cast aside the January 6th Committee's exercise of core legislative functions, let alone enough for a court to throw a wrench into the ongoing working relationship and accommodations between the Political Branches.[15]

Former President Trump's bare allegations of partisan motives do not move the needle either. *See* Appellant Opening Br. 3, 5–6, 15–17, 21–22, 35, 47; Appellant Reply Br. 1–2, 5–8, 11, 19, 25–27, 32; Prelim. Inj. Mem. at 1–4, 8, 17, 33–34. They are unsupported by any plausible factual allegations and cannot stand up to President Biden's substantive explanation for not asserting privilege and Congress's distinct interest in investigating and legislating in response to an attack on itself. To that same point, the presumption of executive regularity "has been recognized since the early days of the Republic."

---

[15] The former President makes a vague reference to presidential discussions during the COVID pandemic in early 2020. *See* Appellant Opening Br. 46. But he makes no argument that any of the documents at issue here involved that topic. Nor is it at all apparent that the Archivist would treat such communications as responsive to the Committee's request, or that President Biden would decline to assert executive privilege over them.

49

*American Fed'n of Gov't Employees v. Reagan*, 870 F.2d 723, 727 (D.C. Cir. 1989). When, as here, "the President exercises an authority confided to him by law, the presumption is that it is exercised in pursuance of law." *Id.* (quoting *Martin v. Mott*, 25 U.S. (12 Wheat.) 19, 32–33 (1827)) (alteration in original).

Former President Trump predicts that, going forward, incumbent Presidents will indiscriminately decline to assert executive privilege over a former President's records whenever they are of the opposite political party. *See* Appellant Opening Br. 47. But the possibility of mutually assured destruction of the privilege cuts against the risk of heedless disclosures.

More to the point, the greatest protection for executive privilege is the natural self-interest of each new occupant of the White House. Presidents of both parties have long jealously guarded the powers and prerogatives of the office. And every incumbent President will be the next former President. That gives the incumbent every incentive to afford robust protection to the confidentiality of presidential communications, even if only to assure receipt of the best possible advice during his or her tenure. *See Nixon v. GSA*, 433 U.S. at 448 ("[A]n incumbent may be inhibited in disclosing confidences of a predecessor when he believes that the effect may be to discourage candid presentation of views by his contemporary advisers."). There are, in other words, "obvious political checks against an incumbent's abuse of the privilege." *Id.*

Former President Trump next speculates about certain communications for which the interests against disclosure could extend beyond a generalized interest in confidentiality, such as communications concerning "complex and sensitive matters of foreign affairs." Appellant Opening Br. 46.

The problem is that he has not pointed to a single record in the existing tranches that implicates a delicate matter of

50

foreign affairs or other "complex and sensitive" topics. Appellant Opening Br. 46.  He also puts the cart before the horse.  For even if the Archivist later were to conclude that such a document was responsive to the Committee's request, it "must be presumed" that the sitting President would factor a document's sensitivity, foreign policy or otherwise, into a future decision whether to assert executive privilege.  *Nixon v. GSA*, 433 U.S. at 449.[16]

**b**

Rather than articulate any superseding interest in confidentiality, former President Trump argues that the courts are obligated to comb through every single document *in camera* to evaluate its privileged nature before it is released. Appellant Opening Br. 38–39; Appellant Reply Br. 14–15. Not so.

First of all, in briefing and at oral argument, counsel for former President Trump was inconsistent in explaining his request for *in camera* review.  *See* Appellant Opening Br. 38–

---

[16] Anyhow, given the Article III courts' general "lack of competence" in matters of national security policy, *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010) (internal quotation marks and citations omitted), former President Trump does not explain how a court could override the sitting President's judgment that release of a document does not imperil, or perhaps advances, foreign relations.  *See also id.* at 34 ("[N]either the Members of this Court nor most federal judges begin the day with briefings that may describe new and serious threats to our Nation and its people.") (quoting *Boumediene v. Bush*, 553 U.S. 723, 797 (2008)); *cf. Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 166 (1803) (Presidential decisions that implicate "foreign affairs" are "entrusted to the executive, [and] the decision of the executive is conclusive").

.

51

39; Appellant Reply Br. 14–15; Oral Arg. Tr. 62:18–63:7, 65:1–6. To the extent that the former President proposes that the court determine whether each document constitutes a privileged presidential communication, that would be a meaningless exercise. *See* Oral Arg. Tr. 62:19–23. President Biden does not dispute that the particular documents at issue qualify for executive privilege. He instead has made the deliberate decision not to invoke that privilege. Therefore, the issue in this case is not whether executive privilege could be asserted for each document. It is whether a court can override President Biden's reasoned decision to forgo privilege as to them and Congress's compelling need for them. So even if the court were to examine each document *in camera* and determine that every single one is privileged, we would simply end up right back where we started.

If what former President Trump means instead is that the court should hunt through the documents in an effort to espy important reasons why President Biden's decision might be ill-advised, he gets the law backwards. *See* Oral Arg. Tr. 65:1–6. Having asserted the importance of confidentiality in these documents based on his expert viewpoint as the President during whose term they were created, former President Trump had the burden of articulating some compelling explanation for nondisclosure to the court. He cannot stand silent and leave it to the court to come up with arguments for him.

Former President Trump insists that "[i]t is vital the Court's analysis be specific[.]" Appellant Reply Br. 16. Our analysis can only be as specific as his claims are.

**c**

Having provided nothing to surmount President Biden's considered judgment, former President Trump pivots to arguing that the January 6th "Committee lacks a specific need

52

for the requested information," Appellant Opening Br. 16, and so its disclosure violates the separation of powers.

Former President Trump sets forth several formulations of the test he believes this court should apply, all of which require that the January 6th Committee do more than meet its burden under the Presidential Records Act to show that the requested documents are "needed for the conduct of its business" and "not otherwise available[,]" 44 U.S.C. § 2205(2)(C). Most prominently, he argues that disclosure is forbidden under the four-factor test laid out in *Mazars*. Appellant Opening Br. 16, 18–20, 23–31; Appellant Reply Br. 21–24, 27–28. At other times, he invokes *Senate Select Committee*'s requirement that the documents be "demonstrably critical to the responsible fulfillment of the Committee's functions." Appellant Opening Br. 22–23 (quoting *Senate Select Comm.*, 498 F.2d at 731). Later, he claims that the Committee must make the "demonstrated and specific showing of need" that was required in *United States v. Nixon.* Appellant Opening Br. 35 (citing *United States v. Nixon*, 418 U.S. at 713).

We have significant doubt that any of these tests are appropriate in the context of a former President's challenge to the joint decision of an incumbent President and the Legislative Branch that disclosure is warranted. All of the cases on which Mr. Trump relies involved requests for information from a sitting President, not a former President, and called upon the courts to resolve an interbranch dispute. The *Mazars* test, for example, was expressly tied to "special concerns regarding the separation of powers" that arise when the "legislative interests of Congress" clash with the "unique position of the President[.]" *Mazars*, 140 S. Ct. at 2035–2036 (internal quotation marks and citation omitted); *cf. United States v. Nixon*, 418 U.S. at 686 (addressing a judicial subpoena issued to a sitting President); *Senate Select Comm.*, 498 F.2d at 726

53

(addressing a congressional subpoena issued to a sitting President). Those separation of powers concerns necessarily have less traction when the request is for records from a former administration, since the objecting former President no longer occupies the "unique position of the President," *Mazars*, 140 S. Ct. at 2035 (internal quotation marks and citation omitted). And they have less salience when the Political Branches are in agreement. *Cf. Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring).

If anything, *Nixon v. GSA* would seem to be more closely on point, because it specifically involved a former President's objection, over the contrary positions of the incumbent President and Congress, to the Executive Branch taking possession of and reviewing his presidential records. There, the Supreme Court ruled that an "important" congressional purpose overcame the former President's privilege claim when, as here, the incumbent President supported the disclosure. *Nixon v. GSA*, 433 U.S. at 454; *see id.* at 443 ("Only where the potential for disruption is present must we then determine whether that impact is justified by an overriding need to promote objectives within the constitutional authority of Congress."). Congress's interest in investigating the January 6th attack on the Capitol and obtaining information to allow meaningful legislation easily rises to the level of "important."

To be sure, *Nixon v. GSA* did not involve a direct document request by Congress. But neither did former President Nixon ask the Court to disrupt an ongoing accommodation and negotiation process between the Political Branches—a process that courts historically have stayed out of.

Regardless, even assuming they apply, the legislative interest at stake passes muster under any of the tests pressed by former President Trump.

54

**(i)**

As for the *Mazars* test, the January 6th Committee plainly has a "valid legislative purpose" and its inquiry "concern[s] a subject on which legislation could be had." *Mazars*, 140 S. Ct. at 2031–2032 (internal quotation marks and citations omitted). In fact, House Resolution 503 expressly authorizes the Committee to propose legislative measures. H.R. Res. 503 § 4(a)(3). For example, Congress could (1) pass laws imposing more serious criminal penalties on those who engage in violence to prevent the work of governmental institutions; (2) amend the Electoral Count Act to shore up the procedures for counting electoral votes and certifying the results of a presidential election; (3) allocate greater resources to the Capitol Police and enact legislation to "elevat[e] the security posture of the United States Capitol Complex," *id.* § 4(a)(2)(D); or (4) revise the federal government's "operational plans, policies, and procedures" for "responding to targeted violence and domestic terrorism[,]" *id.* § 4(a)(2)(B), J.A. 97.

Former President Trump argues that the Committee has an "improper law enforcement purpose[,]" Appellant Opening Br. 21, because its request constitutes an effort to "try" him "for * * * wrongdoing[,]" Appellant Opening Br. 21 (quoting *McGrain*, 273 U.S. at 179). Not at all. The Committee's announced purpose is to "issue a final report to the House containing such findings, conclusions, and recommendations" for such "changes in law, policy, procedures, rules, or regulations" as the Committee "may deem necessary[.]" H.R. Res. 503 § 4(a)(3), (c). The Committee's request to the Archivist reiterates that it "seeks to * * * recommend laws, policies, procedures, rules, or regulations necessary to protect our Republic in the future." Thompson Ltr., J.A. 33. The mere prospect that misconduct might be exposed does not make the

55

Committee's request prosecutorial. Missteps and misbehavior are common fodder for legislation.

*Mazars* also requires that the "asserted legislative purpose warrant[] the significant step of involving the President and his papers." 140 S. Ct. at 2035. As President Biden stated, the January 6th Committee has a "sufficient factual predicate" for obtaining these presidential records, First Remus Ltr., J.A. 107, because of the President's direct role in rallying his supporters, directing them to march to the Capitol, *see* January 6th Rally Speech at 3:47:02–3:47:21, and propagating the underlying false narrative of election fraud. The House has also presented evidence indicating that, leading up to January 6th, individuals encouraging "dramatic action" on that day were in frequent contact with the White House. *See* H.R. REP. NO. 117-152, 117th Cong., 1st Sess. 6 (2021). And as the Commander-in-Chief and Chief Law Enforcement Officer on January 6th, President Trump had control over the sharing of any intelligence concerning a potential riot and, once the mob attacked, the decision to deploy (or not) the National Guard and other federal law enforcement resources to quell the riot.

For those reasons, Congress's request for records "adequately identifies its aims and explains why the President's information will advance its consideration of the possible legislation." *Mazars*, 140 S. Ct. at 2036. It has provided "detailed and substantial" evidence of its legislative purpose, *id.*, and its specific need for presidential records in House Resolution 503, the Committee's letter to the Archivist, public reports, and public statements made by members of the Committee. *See* H.R. Res. 503; Thompson Ltr., J.A. 33–44; H.R. REP. NO. 117-152; 167 CONG. REC. H5759 (daily ed. Oct. 21, 2021) (statement of Rep. Liz Cheney).

56

Nor does Congress have a viable alternative source for this critical information. *See* 44 U.S.C. § 2205(2)(C). As President Biden agreed, the January 6th Committee has shown that these presidential documents specifically are necessary for the Committee's work. Former President Trump has made no showing that the Committee already has access to information about what administration officials knew about the January 6th attack, when they knew it, what actions they took in response, and how their actions might have affected the events of that day. Nor has he demonstrated that the Committee could obtain this same type of information from another source. The information sought pertains to the activities of former President Trump and White House staff in "carrying out the * * * duties of the President" on and around January 6, and those records are exclusively within the control of the Archivist, 44 U.S.C. §§ 2201(2), 2202.

For similar reasons, former President Trump's claim that the Committee is improperly using him as a "'case study' for general legislation" fails. *Mazars*, 140 S. Ct. at 2036 (citation omitted). The Committee is investigating a singular event in this nation's history, in which there is a sufficient factual predicate for inferring that former President Trump and his advisors played a materially relevant role.

Mr. Trump's argument that the January 6th Committee's request to the Archivist is "broader than reasonably necessary to support Congress's legislative objective[,]" *Mazars*, 140 S. Ct. at 2036, does not work either. He has made no claim that the documents at issue in this appeal are not relevant to the Committee's purpose or that a request capturing those documents is overbroad. Nor could he. All of the documents currently at issue pertain to presidential activities on or around January 6th, or surrounding the election and its aftermath.

57

If forthcoming tranches contain records that Mr. Trump claims are unmoored from the Committee's objectives, he can attempt to raise an overbreadth challenge then. But that dispute may never arise. The Archivist will winnow out any documents that are not responsive or that are not "Presidential records[,]" 44 U.S.C. § 2205(2), such as those that are "strictly personal" or "strictly campaign-related[,]" J.A. 275 (counsel for the Executive Branch advising district court that such documents would not be "appropriate for production").

More to the point, President Biden could very well agree to assert executive privilege if aspects of the document request were to overreach the "unique and extraordinary circumstances" that underlay his waiver of privilege for these documents. First Remus Ltr., J.A. 108; *see also* Second Remus Ltr., J.A. 113; Third Remus Ltr., J.A. 173–174. Or he could work with Congress to withdraw its request for those documents as part of the accommodation process.

In short, the "congressional power of inquiry * * * [and] the right of resistance to it are to be judged in the concrete, not on the basis of abstractions." *Barenblatt v. United States*, 360 U.S. 109, 112 (1959). Former President Trump's speculation about possible problems with possible future disclosures does nothing to establish a likelihood of success as to these documents actually slated for disclosure.

Lastly, *Mazars* requires that we "carefully scrutinize[]" any "burdens on the President's time and attention" imposed by the request for information. 140 S. Ct. at 2036. "[I]n determining whether [a challenged act] disrupts the proper balance between the coordinate branches" in that way, the "proper inquiry focuses on the extent to which it prevents the Executive Branch from accomplishing its constitutionally assigned functions." *Nixon v. GSA*, 433 U.S. at 443. In this

58

case, President Biden has determined that, thus far, the time and effort required of him and his staff is within reasonable bounds and consonant with the grave matters before the January 6th Committee.

Former President Trump argues that the large number of potentially responsive records, combined with the limited amount of time he has to review the records for privileged materials, imposes a significant burden on him personally. Appellant Opening Br. 29. But a former President is "in less need of" a shield "against burdensome requests for information" because requiring a former President to respond to a request does not directly implicate the interests of the Executive Branch or distract the President from executing his constitutional functions. *Nixon v. GSA*, 433 U.S. at 448.

Still, if there were no limits to Congress's ability to drown a President in burdensome requests the minute he leaves office, Congress could perhaps use the threat of a post-Presidency pile-on to try and influence the President's conduct while in office. But once again, former President Trump has made no showing that he has been saddled with anything close to such a daunting burden. The Archivist is the one who bears the burden of searching for responsive records. The records he has found have been separated into manageably sized tranches for Mr. Trump's review, which diffuses any burden. And former President Trump has alleged no actual difficulty completing his review of the tranches within the allotted timeframes thus far. If he were to need more time, he could simply request an extension from the Archivist. *See* 36 C.F.R. § 1270.44(g) ("The Archivist may adjust any time period or deadline under this subpart, as appropriate, to accommodate records requested under this section."). In fact, the Archivist has provided additional time for review once already. J.A. 127. Were the burden to become unduly demanding at some point in the

59

future, it could very well be that President Biden—who is simultaneously juggling all manner of presidential responsibilities—would object, to the benefit of former President Trump.  Indeed, the previous extension was initiated by President Biden and afforded to him and former President Trump alike.  J.A. 127.

At the end of the day, the *Mazars* test is of no help to former President Trump's effort to demonstrate a likelihood of success in invalidating the January 6th Committee's request.

**(ii)**

For those same reasons, the Committee's request for these records readily satisfies the other tests that the former President proposes.

In *Senate Select Committee*, this court concluded that evidence subpoenaed from the sitting President was not "demonstrably critical" because the House Committee on the Judiciary already had access to all of the tapes sought by the Select Committee.  498 F.2d at 731–732.  Former President Trump, by contrast, has made no showing that the records at issue here are already within the possession of another committee of the House or Senate.  As such, the Committee's efforts would not be "merely cumulative[,]" and the records remain "demonstrably critical[,]" *id.*, to its task of investigating the January 6th attack.

In *United States v. Nixon*, the Court held that President Nixon's "generalized assertion of privilege" had to "yield to the demonstrated, specific need for evidence in a pending criminal trial."  418 U.S. at 713.  Here, the Committee has—as President Biden agrees—demonstrated a specific and compelling need for these presidential records because they provide a unique and critically important window into the

60

events of January 6th that the Committee cannot obtain elsewhere.

**d**

The former President's remaining arguments do not help his case.

He argues that the Committee has not been authorized by the full House to request a former President's records. *See* Appellant Opening Br. 32–33. That is wrong. House Resolution 503 expressly states that "Rule XI of the Rules of the House of Representatives shall apply to the Select Committee[,]" with exceptions not relevant here. H.R. Res. 503 § 5(c). And House Rule XI provides that "[s]ubpoenas for documents or testimony may be issued to * * * the President, and the Vice President, whether current or former, in a personal or official capacity, as well as the White House, the Office of the President, the Executive Office of the President, and any individual currently or formerly employed in the White House, Office of the President, or the Executive Office of the President[.]" House Rule XI.2(m)(3)(D).

Mr. Trump argues in his reply brief, for the first time in this litigation, that the Presidential Records Act confines an incumbent President to deciding only the "legal correctness" of the former President's privilege claim, without any ability to make a determination as to whether an assertion of privilege is in the best interests of the United States. Appellant Reply Br. 10–11. Former President Trump forfeited this statutory argument by failing to raise it before the district court and before this court in his opening brief. *See American Wildlands v. Kempthorne*, 530 F.3d 991, 1001 (D.C. Cir. 2008) (stating that issues not argued in the opening brief are forfeited on appeal); *Roosevelt v. E.I. Du Pont de Nemours & Co.*, 958 F.2d 416, 419 & n.5 (D.C. Cir. 1992) (Absent exceptional

61

circumstances, "it is not our practice to entertain issues first raised on appeal[.]").  Principles of constitutional avoidance further counsel against entertaining, without adversarial briefing, the notion that a statute shuts the sitting President out of any meaningful role in an exercise of executive privilege over Executive Branch documents in response to a congressional request.  *See Burke*, 843 F.2d at 1479 (citing *Nixon v. GSA*, 433 U.S. at 449).

Lastly, former President Trump argues that, to the extent the Presidential Records Act is construed to give the incumbent President "unfettered discretion to waive former Presidents' executive privilege," it is unconstitutional.  Appellant Opening Br. 47.  There is nothing "unfettered" about President Biden's calibrated judgment in this case.

Anyhow, the Presidential Records Act is explicit that "[n]othing in [the] Act shall be construed to confirm, limit, or expand any constitutionally-based privilege which may be available to an incumbent or former President."  44 U.S.C. § 2204(c)(2).  Therefore, the Presidential Records Act gives the incumbent President no more power than the Constitution already does.  And under the Constitution, the incumbent President does not have "unfettered discretion" to release records over a former President's objection given the former President's opportunity to obtain judicial review of his privilege claim.  *See Nixon v. GSA*, 433 U.S. at 439.

The problem for Mr. Trump is not that the Constitution affords him no say in the matter.  It is his failure to make any relevant showing of a supervening interest in confidentiality that might be capable of overcoming President Biden's considered and weighty judgment that Congress's imperative need warrants the disclosure of these documents specifically tied to the investigation of the events of January 6th.

62

**e**

One factor cutting in former President Trump's favor is that these records are being sought so soon after his Presidency ended.  In *Nixon v. GSA*, the Court explained that the "confidentiality of executive communications" does not dissipate as soon as a President's term ends.  Rather, it is "subject to erosion over time after an administration leaves office."  433 U.S. at 451.  Here, less than a year has passed since Mr. Trump left office.

But the former President does not make this argument.  He only makes an unelaborated reference to the fact of the timing in his opening brief.  *See* Appellant Opening Br. 36.  In this court, "mentioning an argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones is tantamount to failing to raise it."  *Maloney v. Murphy*, 984 F.3d 50, 68 (D.C. Cir. 2020) (internal quotation marks and citation omitted).  He certainly does not present the argument in a manner that gets him any closer to demonstrating a likelihood of success on the merits.  That is especially so given Congress's demonstrated need for the information now because it is investigating a last-ditch effort to thwart the peaceful transfer of power from former President Trump to President Biden.  In light of the regularity of federal elections, we credit the Committee's assertion that its work is "urgent[,]"  Thompson Ltr., J.A. 33, as it seeks to understand the violence that marked the end of the last Presidency and to prevent any recurrence.  First Remus Ltr., J.A. 107; *see also* Second Remus Ltr., J.A. 113; Third Remus Ltr., J.A. 173–174.[17]

_____

[17] At times, former President Trump's briefing suggested that he was pressing a freestanding challenge to the statutory and

63

**V**

Former President Trump has also failed to satisfy any of the remaining preliminary injunction factors.

**A**

To obtain a preliminary injunction, former President Trump must show that the executive-privilege interests he seeks to vindicate will likely be irreparably harmed. *See Winter*, 555 U.S. at 20. Because Mr. Trump seeks this preliminary injunction solely in his "official capacity as a former President[,]" the only relevant injury would be one to the present and future interests of the Executive Branch itself in confidentiality, Compl. ¶ 20, J.A. 16. That is because the interest in confidentiality of presidential communications "is not for the benefit of the President as an individual, but for the benefit of the Republic." *Nixon v. GSA*, 433 U.S. at 449 (citation omitted). So the interests of the Executive Branch are the lens through which we view former President Trump's concerns about vitiating the confidentiality that he relied upon "when the communications and records at issue were created[,]" Appellant Opening Br. 51, and his duty to "protect[] the records and communications created during [his] term of office," Appellant Opening Br. 49.

---

constitutional validity of the Committee's request, separate and apart from his executive privilege claim. *See, e.g.*, Appellant Opening Br. 18; Appellant Reply Br. 1. But at oral argument, Mr. Trump's counsel was explicit that he is not bringing such a challenge and that all of his arguments about the statutory and constitutional validity of the Committee request are part and parcel of his argument that the former President's claim of executive privilege over the specific documents at issue here should prevail. *See* Oral Arg. Tr. 14:21–15:23.

64

The difficulty for Mr. Trump's claim of irreparable harm is that President Biden has already determined that disclosure of the privileged documents in the first three tranches advances the interests of the Executive Branch and is affirmatively in the interests of the United States. Having weighed the interests of the privilege against the January 6th Committee's compelling need for this information, President Biden made a deliberate decision to forgo executive privilege and to disclose the documents. Given the "unprecedented" attack on the Capitol and the tradition of peaceful transfers of power, as well as the "unique and extraordinary circumstances" precipitating and surrounding the attack, President Biden explained that "an assertion of executive privilege is not in the best interests of the United States[.]" First Remus Ltr., J.A. 107–108; *see also* Second Remus Ltr., J.A. 113; Third Remus Ltr., J.A. 173–174.

As between a former President and an incumbent, it "must be presumed" by a court that the incumbent President is "in the best position to assess the present and future needs of the Executive Branch" and to determine whether disclosure "impermissibly intrudes into the executive function[,]" *Nixon v. GSA*, 433 U.S. at 449, or otherwise will "prevent[] the Executive Branch from accomplishing its constitutionally assigned functions," *id*. at 443.

To be sure, executive privilege is vital to the effective operations of the Presidency. *See United States v. Nixon*, 418 U.S. at 708. But it is a qualified privilege that has been waived by Presidents—including by President Trump—when they determined that the overriding interests of the Nation warranted it. *See* page 41, *supra*. The former President has not alleged or shown that such waivers irreparably harmed the operation of the Executive Branch or impaired his ability as President, or the ability of other Presidents, to obtain needed confidential advice.

65

The uniqueness of the circumstances prompting disclosure here further mitigates any potential harm to the "full and frank" nature of presidential communications. *Nixon v. GSA*, 433 U.S. at 449 (citation omitted). Advisors of the President are unlikely to "be moved to temper the candor of their remarks" simply because of the "infrequent occasions" on which an event as unparalleled as January 6th might arise. *United States v. Nixon*, 418 U.S. at 712.

Former President Trump argues that President Biden "lacks context and information concerning the documents in question" and "cannot fairly evaluate President Trump's rights." Appellant Opening Br. 51. But beyond that unelaborated assertion, Mr. Trump has made no record nor even hinted to this court what context or information has been overlooked or what information could override President Biden's calculus. We cannot just presume it. Nor can we, on our own, hunt through the documents for sensitivities or concerns that have never been articulated by Mr. Trump. The former President no doubt begs to differ with President Biden's judgment. But that difference of opinion by itself establishes no likelihood of irreparable harm to the Presidency or the interests protected by executive privilege.

We acknowledge that irreparable injury is frequently found when a movant seeks to prevent the disclosure of privileged documents pending litigation. That is generally because the holders of the privileges will, themselves, be irreparably harmed by release, and time is not of the essence.

This case is materially different from the mine-run of privilege cases. The privilege being asserted is not a personal privilege belonging to former President Trump; he stewards it for the benefit of the Republic. The interests the privilege protects are those of the Presidency itself, not former President

66

Trump individually. And the President has determined that immediate disclosure will promote, not injure, the national interest, and that delay here is itself injurious.[18]

**B**

Mr. Trump argues that the Committee "would suffer no harm by delaying production while the parties litigate the request's validity." Appellant Opening Br. 52. We disagree. Both the public interest and the balance of hardships decidedly disfavor issuance of a preliminary injunction.

Even under ordinary circumstances, there is a strong public interest in Congress carrying out its lawful investigations, *McGrain*, 273 U.S. at 174, and courts must take care not to unnecessarily "halt the functions of a coordinate branch," *Eastland*, 421 U.S. at 511 n.17.

That public interest is heightened when, as here, the legislature is proceeding with urgency to prevent violent attacks on the federal government and disruptions to the peaceful transfer of power. Importantly, the Supreme Court has instructed that Congress's "desire to restore public confidence in our political processes" by "facilitating a full airing of the events leading to" such political crises constitutes a "substantial public interest[.]" *Nixon v. GSA*, 433 U.S. at 453.

Reinforcing that public interest, President Biden has concluded on behalf of the Executive Branch that disclosure is "in the best interests of the United States[.]" First Remus Ltr.,

---

[18] Nor is an injunction necessary to preserve jurisdiction. Disclosure of these documents will not end the case as more tranches of documents are forthcoming. *See also* note 7, *supra*.

67

J.A. 107; *see also* Second Remus Ltr., J.A. 113; Third Remus Ltr., J.A. 173–174.

Mr. Trump has not advanced any formulation of the public interest or balance of hardships that can overcome those weighty interests and concerns.

\* \* \* \* \*

For all of the foregoing reasons, former President Trump has not shown that he is entitled to a preliminary injunction.

We do not come to that conclusion lightly. The confidentiality of presidential communications is critical to the effective functioning of the Presidency for the reasons that former President Trump presses, and his effort to vindicate that interest is itself a right of constitutional import.

But our Constitution divides, checks, and balances power to preserve democracy and to ensure liberty. For that reason, the executive privilege for presidential communications is a qualified one that Mr. Trump agrees must give way when necessary to protect overriding interests. *See* Oral Arg. Tr. 33:18–21, 34:23–25. The President and the Legislative Branch have shown a national interest in and pressing need for the prompt disclosure of these documents.

What Mr. Trump seeks is to have an Article III court intervene and nullify those judgments of the President and Congress, delay the Committee's work, and derail the negotiations and accommodations that the Political Branches have made. But essential to the rule of law is the principle that a former President must meet the same legal standards for obtaining preliminary injunctive relief as everyone else. And former President Trump has failed that task.

68

Benjamin Franklin said, at the founding, that we have "[a] Republic"—"if [we] can keep it."[19]  The events of January 6th exposed the fragility of those democratic institutions and traditions that we had perhaps come to take for granted.  In response, the President of the United States and Congress have each made the judgment that access to this subset of presidential communication records is necessary to address a matter of great constitutional moment for the Republic.  Former President Trump has given this court no legal reason to cast aside President Biden's assessment of the Executive Branch interests at stake, or to create a separation of powers conflict that the Political Branches have avoided.

The judgment of the district court denying a preliminary injunction is affirmed.[20]

*So ordered.*

---

[19]    PAPERS OF DR. JAMES MCHENRY ON THE FEDERAL CONVENTION OF 1787 (1787), *in* DOCUMENTS ILLUSTRATIVE OF THE FORMATION OF THE UNION OF THE AMERICAN STATES 952 (Charles C. Tansill ed., 1927).

[20] This court's administrative injunction, entered November 11, 2021, will be dissolved in 14 days, reflecting the amount of time the former President's counsel requested to file a petition for a writ of certiorari and an accompanying motion for an injunction pending review with the Supreme Court.  *See* Oral Arg. Tr. 152:21–23.  But if such a motion is filed, the administrative injunction will dissolve upon the Supreme Court's disposition of that motion.